UAW v GREEN

Docket No. 314781. Original action filed February 14, 2013. Submitted
without oral argument April 11, 2013. Decided August 15, 2013, at
9:10 a.m. Leave to appeal sought.

The International Union, United Automobile, Aerospace, and Agricul-
tural Implement Workers of America; UAW Local 6000; Michigan
Corrections Organization, SEIU Local 526; Michigan Public Employ-
ees, SEIU Local 517M; and Michigan State Employees Association,
AFSCME, Local 5 brought an action in the Court of Appeals against
Michigan Employment Relations Commission members Nino E.
Green, Edward D. Callaghan, and Robert LaBrant; the Governor;
and the Attorney General, seeking declaratory relief that portions of
the amendments of the public employment relations act (PERA),
MCL 423.201 *et seq.*, enacted by 2012 PA 349 were unconstitutional
with respect to employees in the classified state civil service. MCL
423.210(3)(d), as amended by 2012 PA 349, provides that a public
employer may not require governmental employees to join a union or
pay union dues, fees, or other expenses as a condition of obtaining or
continuing public employment. Plaintiffs asserted that with respect
to state civil service employees, the amendments intruded on the
authority of the Civil Service Commission (CSC) under Const 1963,
art 11, § 5 to regulate all conditions of those individuals' employment
and that the CSC rather than the Legislature has the authority to
decide whether payments to unions by civil service employees should
be mandatory or voluntary.

The Court of Appeals, without hearing oral argument, *held*:

1. The Legislature has the authority to enact legislation with
regard to agency fees, and the amendments enacted by 2012 PA
349 apply to employees in the classified state civil service.

2. Const 1963, art 11, § 5 provides that the CSC shall regulate
all conditions of employment in the classified state civil service.
With regard to public employees, Const 1963, art 4, § 48 states that
the Legislature may enact laws providing for the resolution of
disputes concerning public employees except those in the classified
state civil service. However, with regard to all employees, Const
1963, art 4, § 49 provides that the Legislature may enact laws

relative to the hours and conditions of employment. 2012 PA 349 did not address the resolution of public employee labor disputes and therefore did not come within the restriction of Const 1963, art 4, § 48. Pursuant to MCL 423.204a, the Legislature's powers apply to civil service employees to the extent that the Legislature has the power to control state employment under Const 1963, art 4, § 49. Thus, certain provisions of PERA apply to employees in the classified civil service, including those enacted by 2012 PA 349.

3. Civ Serv R 6-7.2 states that a governmental employer may enter into an agreement with a union that as a condition of continued employment, an employee who chooses not to join the union must pay a service fee to the union, which directly conflicts with the amendments enacted by 2012 PA 349. That act, however, was a proper exercise of the Legislature's constitutional authority under Const 1963, art 4 § 49 to enact laws relative to conditions of employment. The ratification of Const 1963, art 4, §§ 48 and 49 and art 11, § 5 clearly indicates that the people of Michigan intended for the Legislature to retain authority over public employment disputes involving employees outside the classified state civil service and over the hours and conditions of employment of all employees, without excluding those in the classified state civil service. By ratifying a Constitution containing all three provisions, the people demonstrated their intent to distinguish civil service employees from other public employees in some, but not all, contexts and impose legislative checks and balances on the CSC's authority. "Regulate," the term used in Const 1963, art 11, § 5 with respect to the CSC's authority, means to govern, direct, or control according to rule, law, or authority. Therefore, the CSC's power to issue rules governing civil service employment is not limitless in scope, but is subject to and in accordance with the Legislature's power to enact laws regarding conditions of employment. The Legislature has the broad power to enact laws relative to the conditions of all employment, whereas the CSC has the narrow power to regulate conditions of civil service employment.

Gleicher, J., dissenting, would have held that the agency-fee restrictions of 2012 PA 349 unconstitutionally infringed the CSC's power under Const 1963, art 11, § 5 to regulate all conditions of employment in the classified state civil service, in violation of the separation of powers. The CSC determined that collective bargaining enhances the employment conditions of its work force. Because this judgment comported with the CSC's constitutional authority, Civ Serv R 6-7.2 constituted a legitimate exercise of the CSC's power and the agency fees it authorized were not subject to legislative elimination.

PUBLIC EMPLOYMENT — CLASSIFIED CIVIL SERVICE — UNIONS — MANDATORY
AGENCY FEES — LEGISLATIVE POWER TO PROHIBIT.

Const 1963, art 11, § 5 provides that the Civil Service Commission
regulates all conditions of employment in the classified state civil
service; Const 1963, art 4, § 48 states that the Legislature may
enact laws providing for the resolution of disputes concerning
public employees except those in the state classified civil service,
but with regard to all employees, Const 1963, art 4, § 49 provides
that the Legislature may enact laws relative to the hours and
conditions of employment; MCL 423.210(3)(d), as amended by
2012 PA 349, which provides that a public employer may not
require governmental employees to join a union or pay union dues,
fees, or other expenses as a condition of obtaining or continuing
public employment, is thus within the scope of the Legislature's
power to control state employment and is constitutional.

*William A. Wertheimer*, *Michael B. Nicholson*, and
*Ava R. Barbour* for the UAW and UAW Local 6000.

*William A. Wertheimer* and *Sachs Waldman, PC* (by
*Andrew Nickelhoff*), for Michigan Corrections Organi-
zation, SEIU Local 526; and Michigan Public Employ-
ees, SEIU Local 517M.

*William A. Wertheimer* and *Fraser, Trebilcock, Davis
& Dunlap, PC* (by *Michael E. Cavanaugh* and *Brandon
W. Zuk*), for Michigan State Employees Association,
AFSCME, Local 5.

*Bill Schuette*, Attorney General, *John J. Bursch*,
Solicitor General, *Richard A. Bandstra*, Chief Legal
Counsel, and *Ann M. Sherman* and *Margaret A. Nelson*,
Assistant Attorneys General, for Nino E. Green, Ed-
ward D. Callaghan, Robert LaBrant, the Governor, and
the Attorney General.

Amicus Curiae:

*Miller, Canfield, Paddock and Stone, PLC* (by
*Michael J. Hodge* and *Scott R. Eldridge*), for the Civil
Service Commission.

Before: Saad, P.J., and Donofrio and Gleicher, JJ.

Saad, P.J.

### I. INTRODUCTION

As an intermediate appellate court, we typically decide appeals of orders issued by lower courts. But here, the Legislature placed in this Court exclusive original jurisdiction over challenges to 2012 PA 349 (PA 349), colloquially called a "right to work" law. MCL 423.210(6). PA 349 amends the public employment relations act (PERA), MCL 423.201 *et seq.*,[1] and states that public employers—that is, the government—cannot require governmental employees to join a union or pay union dues, fees, or other expenses "as a *condition of obtaining or continuing public employment . . . .*" MCL 423.210(3)(d) (emphasis added).

Also, typically, courts entertain constitutional challenges to substantive provisions of legislation. However, this action does not challenge the Legislature's public-policy decision to amend public-sector labor law to make financial contributions to unions voluntary instead of compulsory. Nor does it challenge the Legislature's right to make such laws applicable to public employees. Rather, plaintiff unions challenge the Legislature's constitutional authority to pass PA 349 and defendants' right to enforce it with respect to a subset of public-sector employees—those in the classified state civil service. Plaintiffs premise this challenge on the Constitution's carveout for a civil service system and the Michigan Civil Service Commission (CSC). Unlike other governmental employees, those workers identified in Const 1963, art 11, § 5 are part of the classified

---

[1] Unless otherwise noted, all references to or citations of PERA in this opinion are to that act as amended by 2012 PA 349.

civil service, and they work under the aegis of the CSC. Pursuant to article 11, § 5, the CSC has the authority to "regulate all conditions of employment" for this group of governmental employees. Plaintiff unions and the CSC, as amicus curiae, argue that, within this limited arena, PA 349 intrudes on the CSC's sphere of authority. Defendants respond that, under the Michigan Constitution, the Legislature has the power to make laws applicable to all employees, public and private, including classified civil service employees. Defendants further maintain that the Legislature has done so in the past with the approval of our courts.

Since the most recent adoption of the Michigan Constitution in 1963 and the 1965 passage of PERA, our courts have not addressed the specific question before us. That is, in light of this historical, constitutional sharing of responsibilities for rulemaking by the CSC with respect to classified employees and lawmaking by the Legislature with respect to all employees, the issue of first impression is which governmental actor— the Legislature or the CSC—has the power to decide whether the payment of fees by classified civil service employees to unions should be mandatory or voluntary. This is the limited, narrow question we address as the statute directs, and as the parties ask.

## II. STANDARDS OF REVIEW

Because the arguments raised involve the interpretation of provisions of the Michigan Constitution, we turn to the principles set forth in *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405-406; 185 NW2d 9 (1971), which addresses the "construction of a constitution":

The primary rule is the rule of "common understanding" described by Justice COOLEY:

A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed." (Cooley's Const Lim 81). (Emphasis added.)

\* \* \*

A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. On this point this Court said the following:

In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished. *Kearney* v. *Board of State Auditors* (1915), 189 Mich 666, 673 [155 NW 510].

A third rule is that wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does. Chief Justice Marshall pursued this thought fully in *Marbury* v. *Madison* (1803), 5 US (1 Cranch) 137 (2 L Ed 60), which we quote in part:

If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction, \* \* \*.

And while we recognize the political, economic, and social controversies underlying the enactment of PA 349, they are unrelated to our duty to apply these

principles of constitutional interpretation. Indeed, "when a court confronts a constitutional challenge it must determine the controversy stripped of all digressive and impertinently heated veneer lest the Court enter—unnecessarily this time—another thorny and trackless bramblebush of politics." *Straus v Governor*, 459 Mich 526, 531; 592 NW2d 53 (1999), quoting *Taylor v Dearborn Twp*, 370 Mich 47, 50; 120 NW2d 737 (1963) (BLACK, J., joined by T. M. KAVANAGH, J.) (citation and quotation marks omitted).

Moreover, when a party seeks our declaration that a statute violates the Constitution, we must operate with the presumption that the statute is constitutional "unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). As our Supreme Court further explained in *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307-308; 806 NW2d 683 (2011):

> "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004). " 'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.' " *Id.* at 423, quoting *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with the party challenging it," *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007) . . . . "[W]hen considering a claim that a statute is unconstitutional, the Court does not inquire into the wisdom of the legislation." *Taylor*, 468 Mich at 6.

Thus, in keeping with the law that governs our review of this legislation, we begin with the presumption that PA 349 is constitutional and proceed with the utmost caution to determine whether the plaintiff unions have met their burden of proof to show otherwise.

### III. DISCUSSION

#### A. THE MICHIGAN CONSTITUTION, THE ESTABLISHMENT OF THE CSC, AND THE ENACTMENT OF PERA

Our analysis necessarily begins with the Constitution itself and the particular sections applicable to the dispute. Pursuant to Const 1963, art 3, § 2:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

"Subject only to limitations and restrictions imposed by the State or Federal Constitutions, the State legislature is the repository of all legislative power." *Huron-Clinton Metro Auth v Bds of Supervisors of Five Cos*, 300 Mich 1, 12; 1 NW2d 430 (1942). Indeed, as our Supreme Court has explained, with these limitations, the Michigan Legislature "possesses all of the power possessed by the parliament of England," *Doyle v Detroit Election Comm*, 261 Mich 546, 549; 246 NW 220 (1933), and "can do anything which it is not prohibited from doing by the people through the Constitution of the State or of the United States," *Attorney General, ex rel O'Hara v Montgomery*, 275 Mich 504, 538; 267 NW 550 (1936). Thus, " '[t]he purpose and object of a State Constitution are not to make specific grants of legislative power, but to limit that power when it would otherwise be

general or unlimited.' " *Young v Ann Arbor*, 267 Mich
241, 244; 255 NW 579 (1934) (citation omitted).

With regard to public employees, Const 1963, art 4,
§ 48 states that "[t]he legislature may enact laws pro-
viding for the resolution of disputes concerning public
employees, except those in the state classified civil
service." However, with regard to all employees, the
Constitution provides, pursuant to article 4, § 49, that
"[t]he legislature may enact laws relative to the hours
and conditions of employment."

The civil service system was originally created by the
Legislature "to eliminate the spoils system and prohibit
participation in political activities during the hours of
employment." *AFSCME Council 25 v State Employees'
Retirement Sys*, 294 Mich App 1, 10; 818 NW2d 337
(2011). A report drafted by a group appointed by then
Governor Frank Fitzgerald had revealed:

> "The spoils system presupposes the existence of govern-
> ment jobs to be filled with loyal party workers who can be
> counted on not to do the state job better than it can be done
> by others, but rather to do the party work or the candidate
> work when elections roll around. The state office buildings
> are nearly empty during political conventions, and state
> money has always been used—indirectly of course—to
> enable state employees to move about the state and keep
> political fences in repair.
>
> "It is impossible to estimate the loss to the state of this
> kind of political activity, but the most inexperienced know
> that the amount is considerable. Not only is the regular
> work of the state interrupted or interfered with, but its
> services and funds are put at the disposal of political
> parties." [*Council No 11, AFSCME v Civil Serv Comm*, 408
> Mich 385, 397 n 10; 292 NW2d 442 (1980), quoting Report
> of the Civil Service Study Commission, July 20, 1936.]

The essence of the legislation that followed, 1937 PA
346, was preventing state workers from engaging in

political activities during working hours. However, in the next session in 1939, the new Legislature made various changes, in evident opposition to the reforms intended by 1937 PA 346, including making a significant number of positions exempt from classified civil service. *Council No 11*, 408 Mich at 399-400. "Finally, in 1940, apparently dissatisfied with four years of political maneuvering and legislative advance and retreat on the civil service system issue, the people of Michigan adopted a constitutional amendment establishing a constitutional state civil service system, superseding the 1939 legislation." *Id.* at 400-401. The amendment, Const 1908, art 6, § 22, focused not on barring employees from political activities, but on establishing a merit system for hiring, promotions, demotions, and terminations. *Id.* at 401. Thus, the fundamental purpose of the amendment was to provide for an unbiased commission to promulgate and enforce rules to ensure a merit-based system of governmental hiring and employment. The people adopted the civil service provisions in much the same form in the 1963 Constitution. Specifically, Const 1963, art 11, § 5, provides, in part:

> The classified state civil service shall consist of all positions in the state service except those filled by popular election, heads of principal departments, members of boards and commissions, the principal executive officer of boards and commissions heading principal departments, employees of courts of record, employees of the legislature, employees of the state institutions of higher education, all persons in the armed forces of the state, eight exempt positions in the office of the governor, and within each principal department, when requested by the department head, two other exempt positions, one of which shall be policy-making. The civil service commission may exempt three additional positions of a policy-making nature within each principal department.

The civil service commission shall be non-salaried and shall consist of four persons, not more than two of whom shall be members of the same political party, appointed by the governor for terms of eight years, no two of which shall expire in the same year.

The administration of the commission's powers shall be vested in a state personnel director who shall be a member of the classified service and who shall be responsible to and selected by the commission after open competitive examination.

The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.

* * *

No person shall be appointed to or promoted in the classified service who has not been certified by the commission as qualified for such appointment or promotion. No appointments, promotions, demotions or removals in the classified service shall be made for religious, racial or partisan considerations.

Increases in rates of compensation authorized by the commission may be effective only at the start of a fiscal year and shall require prior notice to the governor, who shall transmit such increases to the legislature as part of his budget. The legislature may, by a majority vote of the members elected to and serving in each house, waive the notice and permit increases in rates of compensation to be effective at a time other than the start of a fiscal year. Within 60 calendar days following such transmission, the legislature may, by a two-thirds vote of the members elected to and serving in each house, reject or reduce

increases in rates of compensation authorized by the commission. Any reduction ordered by the legislature shall apply uniformly to all classes of employees affected by the increases and shall not adjust pay differentials already established by the civil service commission. The legislature may not reduce rates of compensation below those in effect at the time of the transmission of increases authorized by the commission.

\*   \*   \*

The civil service commission shall recommend to the governor and to the legislature rates of compensation for all appointed positions within the executive department not a part of the classified service.

To enable the commission to exercise its powers, the legislature shall appropriate to the commission for the ensuing fiscal year a sum not less than one percent of the aggregate payroll of the classified service for the preceding fiscal year, as certified by the commission. Within six months after the conclusion of each fiscal year the commission shall return to the state treasury all moneys unexpended for that fiscal year.

The commission shall furnish reports of expenditures, at least annually, to the governor and the legislature and shall be subject to annual audit as provided by law.

As our Supreme Court has observed, the CSC is a constitutionally established administrative agency that is part of and within the executive branch. *Straus*, 459 Mich at 537; see also *House Speaker v Governor*, 443 Mich 560, 587 n 33; 506 NW2d 190 (1993). However, that the CSC exists within the Constitution does not, as plaintiffs would suggest, elevate the CSC to a fourth branch of government because no fourth branch exists and because to do so would directly violate the separation of powers provision in article 3, § 2. *Straus*, 459 Mich at 535-537. Nonetheless, the CSC indisputably has the power to "regulate all conditions of employment

in the classified civil service." Const 1963, art 11, § 5; see *Mich State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 163-164; 365 NW2d 93 (1984); *Plec v Liquor Control Comm*, 322 Mich 691, 694; 34 NW2d 524 (1948).

PA 349 is an amendment of PERA, which was enacted in 1965 pursuant to the "explicit constitutional authorization" in Const 1963, art 4, § 48 ("The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service."). *Local 1383, Int'l Ass'n of Fire Fighters v City of Warren*, 411 Mich 642, 651; 311 NW2d 702 (1981). PERA's dispute resolution provisions do not apply to employees in the classified civil service pursuant to the plain language of article 4, § 48. *Viculin v Dep't of Civil Serv*, 386 Mich 375, 393; 192 NW2d 449 (1971) ("The Civil Service Commission is a constitutional body possessing plenary power and may determine, consistent with due process, the procedures by which a state civil service employee may review his grievance."). Again, however, the Legislature, pursuant to article 4, § 49, has "the sovereign police power to regulate the terms and conditions of employment for the welfare of Michigan workers . . . ." *Western Mich Univ Bd of Control v Michigan*, 455 Mich 531, 536; 565 NW2d 828 (1997).

Section 4a of PERA states that "[t]he provisions of this act as to state employees within the jurisdiction of the civil service commission shall be deemed to apply in so far as the power exists in the legislature to control employment by the state or the emoluments thereof." MCL 423.204a. The parties disagree about the proper interpretation and application of these provisions. Plaintiffs and the CSC argue that article 4, § 48 precludes legislative involvement within the sphere of the

CSC's constitutional authority, and they extend this argument to § 4a of PERA by maintaining that all areas of civil service employment are exempt from all provisions of PERA and that PERA has no application to the civil service because it was born from the Legislature's purportedly limited power under article 4, § 48.

The plain and unambiguous language of article 4, § 48 grants the Legislature the power to enact a statutory scheme for resolving public-sector-employee disputes that arise outside the classified civil service. Clearly, PA 349 does not address resolution of public-employee labor disputes, and therefore does not come within the article 4, § 48 restriction. Moreover, the plain language of MCL 423.204a—"[t]he provisions of this act as to state employees within the jurisdiction of the civil service commission *shall be deemed to apply in so far as the power exists in the legislature to control employment by the state*"—clearly expresses that the legislative powers apply to civil service employees *to the extent that* the Legislature has the power to control state employment. (Emphasis added.) See, e.g., Const 1963, art 4, § 49. Plaintiffs' interpretation of § 4a as a nullification of legislative power over the civil service contravenes the plain meaning of the statutory language. Additionally, § 1 of PERA defines "public employee" as follows:

> "Public employee" means a person holding a position by appointment or employment in the government of this state, in the government of 1 or more of the political subdivisions of this state, in the public school service, in a public or special district, in the service of an authority, commission, or board, or in any other branch of the public service, subject to the following exceptions .... [MCL 423.201(e).]

The three enumerated exceptions are as follows: (1) employees of a private entity under a time-limited

contract with the state, (2) public-school administrators in specific circumstances, and (3) graduate student research assistants when there are insufficient indicia of an employer-employee relationship. MCL 423.201(e)(*i*) through (*iii*). Civil service employees are public employees within the definition in MCL 423.201(e), and civil service employees do not come within any of the enumerated exceptions.

Despite the plain constitutional provision (article 4 § 49) and statutory language reserving a degree of legislative control over civil service employment (MCL 423.204a), plaintiffs cite cases that purportedly hold that PERA has no application to civil service employees, but all those cases involved civil service employees and resolution of employment *disputes*. For example, to the extent *Bonneville v Mich Corrections Org*, 190 Mich App 473, 477; 476 NW2d 411 (1991), made the assertion that PERA does not apply to classified civil service employees, *Bonneville* involved grievance resolution, so this statement was dicta to the extent that it exempts civil service employees from all provisions of PERA. Further, contrary to the CSC's argument, *SEIU Local 79 v State Racing Comm'r*, 27 Mich App 676, 681; 183 NW2d 854 (1970), does not broadly preclude application of all provisions of PERA to all employees under the CSC's jurisdiction. It only stated that PERA and the Michigan Employment Relations Commission's jurisdiction did not apply to the resolution of the dispute between the employee veterinarians and the employer racing commissioner because the employees were under the CSC's jurisdiction. For these reasons, and those that follow, we read article 11, § 5 and article 4 § 49 in harmony and hold that, as correctly stated in MCL 423.204a, certain provisions of PERA apply to employees in the classified civil service, including those in PA 349.

B. CIVIL SERVICE RULE 6-7.2 AND 2012 PA 349

Plaintiffs and the CSC contend that the imposition of an agency fee is a "condition of employment" as contemplated by article 11, § 5 and, therefore, that PA 349 impermissibly infringes on a matter within the CSC's constitutional authority. Defendants respond that, pursuant to Const 1963, article 4, § 49, "[t]he legislature may enact laws relative to . . . conditions of employment" and that the CSC's power to "regulate" conditions of employment does not supersede or negate the Legislature's authority to enact PA 349.

The CSC has adopted rules giving it "sovereign authority" to approve, reject, or modify a negotiated collective-bargaining agreement. Civ Serv R 6-3.1, 6-3.5, and 6-3.6. The Civil Service Rules further state that civil service employees have the right to "organize, form, assist, join, or refrain from joining labor organizations." Civ Serv R 6-5.1. However, Civ Serv R 6-7.2 states that a governmental employer may enter into an agreement with a union which provides that "as a condition of continued employment," an employee who chooses not to join the union "shall pay a service fee" to the union.[2]

For decades, MCL 423.209 has granted public employees the right to form, join, or assist in labor organizations and engage in activities related to the collective-bargaining process. MCL 423.209, as added by 1965 PA 379; MCL 423.209(1)(a); *City of Escanaba v Labor Mediation Bd*, 19 Mich App 273, 280; 172 NW2d 836 (1969). Importantly, PA 349 preserves these rights, but also grants public employees the right to "[r]efrain

---

[2] The amount of the fee "cannot exceed the employee's proportionate share of the costs of the activities that are necessary to perform its duties as the exclusive representative in dealing with the employer on labor-management issues." Civ Serv R 6-7.3.

from any or all" of these activities. MCL 423.209(1)(b). PA 349 also added subsections (2) and (3) to section 9, which provide as follows:

> (2) No person shall by force, intimidation, or unlawful threats compel or attempt to compel any public employee to do any of the following:
>
> (a) Become or remain a member of a labor organization or bargaining representative or otherwise affiliate with or financially support a labor organization or bargaining representative.
>
> (b) Refrain from engaging in employment or refrain from joining a labor organization or bargaining representative or otherwise affiliating with or financially supporting a labor organization or bargaining representative.
>
> (c) Pay to any charitable organization or third party an amount that is in lieu of, equivalent to, or any portion of dues, fees, assessments, or other charges or expenses required of members of or public employees represented by a labor organization or bargaining representative.
>
> (3) A person who violates subsection (2) is liable for a civil fine of not more than $500.00. A civil fine recovered under this section shall be submitted to the state treasurer for deposit in the general fund of this state. [MCL 423.209(2) and (3).]

Before PA 349, MCL 423.210(1) included a provision similar to Civ Serv R 6-7.2, that a public employer could agree with a union that those employees who chose not to join a union must pay "a service fee equivalent to the amount of dues uniformly required of members of the exclusive bargaining representative." MCL 423.210(1), as amended by 2012 PA 53. PA 349 amended § 10 by granting rights to individual public employees, with the exception of certain police and fire employees, as follows:

> (3) Except as provided in subsection (4), an individual shall not be required as a condition of obtaining or continuing public employment to do any of the following:

(a) Refrain or resign from membership in, voluntary affiliation with, or voluntary financial support of a labor organization or bargaining representative.

(b) Become or remain a member of a labor organization or bargaining representative.

(c) Pay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value to a labor organization or bargaining representative.

(d) Pay to any charitable organization or third party any amount that is in lieu of, equivalent to, or any portion of dues, fees, assessments, or other charges or expenses required of members of or public employees represented by a labor organization or bargaining representative. [MCL 423.210(3).]

These legislative amendments change Michigan law regarding compulsory union fees with respect to all public-sector employees and employers and, therefore, directly conflict with the CSC's rule that permits the government to enter into agreements with unions to require compulsory union contributions by nonunion public employees.

### C. CONSTITUTIONAL ANALYSIS

The arguments presented are rooted in a dispute over the phrase "conditions of employment" which appears in both article 4, § 49 and article 11, § 5. As discussed, Const 1963, art 11, § 5 confers on the CSC the power to "regulate all conditions of employment in the classified service," but article 4, § 49 confers on the Legislature the power to "enact laws relative to the hours and conditions of employment."

Plaintiff unions urge that the decision whether to impose agency fees on nonunion employees constitutes a condition of employment. Were we to accept this as true, it is equally clear that what Civ Serv R 6-7.2

authorizes also amounts to a condition *for* employment, because it permits a governmental employer to require an agency fee payment "as a condition *of continued* employment," thus permitting termination for failure to comply. (Emphasis added.) In either case, the characterization does not render PA 349 unconstitutional. Indeed, we hold that, regardless of whether the mandatory payment of agency fees by nonunion civil service employees amounts to a condition of employment or a condition to obtain or retain employment, PA 349 is a proper exercise of the Legislature's constitutional authority to "enact laws relative to . . . conditions of employment." Const 1963, art 4, § 49.

Our holding is compelled by a plain reading of our Constitution and an interpretation that reasonable minds and the great mass of people would give it. As noted, Const 1963, art 4, § 48 provides that "[t]he legislature may enact laws providing for the resolution of disputes concerning public employees, *except those in the state classified civil service*." (Emphasis added.) Const 1963, art 4, § 49 provides that "[t]he legislature may enact laws relative to the hours and conditions of employment." The language of these two paragraphs, read together and in conjunction with article 11, § 5, clearly indicate that the people of Michigan intended for the Legislature to retain authority over public-employment disputes involving employees outside the classified state civil service and over the hours and conditions of employment of all employees, without excluding those in the classified civil service. By ratifying a Constitution containing all three provisions, the people evinced their intent to distinguish classified civil service employees from other public employees in some, but not all, contexts and impose legislative checks and balances on the CSC's authority.

Clearly, article 4, § 49 confers on the Legislature the power to enact laws ("may enact"), specifications, and requirements governing employment generally, including civil service employment, while article 11, § 5 requires the CSC to *regulate* conditions of employment ("shall regulate") consistently with the legislative enactments. Again, when we interpret a provision of the Michigan Constitution, the words of that provision "must be given their ordinary meanings." *Co Rd Ass'n of Mich v Governor*, 260 Mich App 299, 306; 677 NW2d 340 (2004) (citation and quotation marks omitted). The ordinary meaning of the word "regulate" can be found in the first definition of "regulate" in *Merriam-Webster's Collegiate Dictionary*:

> **1 a** : to govern or direct according to rule **b** (1) : to bring under the control of law or constituted authority (2) : to make regulations for or concerning ... **2** : to bring order, method, or uniformity to ... **3** : to fix or adjust the time, amount, degree, or rate of .... [*Merriam-Webster's Collegiate Dictionary* (11th ed, 2006) p 1049.]

Thus, the ordinary meaning of the word "regulate" is to govern, direct, or control *according to rule, law, or authority*. Therefore, the CSC's power to issue rules governing civil service employment is not limitless in scope, but is subject to and in accordance with the Legislature's power to "enact laws" regarding "conditions of employment." Const 1963, art 4, § 49.

Plaintiffs argue that defendants' emphasis on the meaning of "regulate" imposes a "hyper-technical" construction that is contrary to the common understanding of the people who ratified the Constitution and contrary to the caveat against finding a "dark and abstruse meaning" in constitutional language. *Traverse City*, 384 Mich at 405 (citation and quotation marks omitted). "Regulate" is not an obscure word, and its meaning as

compared to the phrase "enact laws" is not subtle. Clearly, the choice of words—*regulate* for the CSC and *enact laws* for the Legislature—renders article 11, § 5 and article 4, § 49 consistent. Plaintiffs attempt to minimize the significance of article 4, § 49 by arguing that this provision is merely a holdover from the 1908 Constitution and the Progressive Era, when the ratifiers granted the Legislature the power to "enact laws relative to the hours and conditions under which men, women, and children may be employed." Const 1908, art 5, § 29. Plaintiffs state that this provision was intended only to clarify that the right to freedom of contract did not override the Legislature's police power to enact wage, hour, and safety laws for the benefit of workers. Plaintiffs' argument ignores the plain language of article 4, § 49, which grants the Legislature the power to enact laws "relative to the hours *and conditions* of employment." (Emphasis added.) If the ratifiers had intended for article 4, § 49 to limit the Legislature's powers to enacting wage and hour requirements, they could have so limited the Legislature's authority in the Constitution.

Moreover, in contrast to article 4, § 48, which confers on the Legislature the power to "enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service," article 4, § 49 does not provide an exception for civil service employees. We cannot assume that the exception for civil service employees, which was purposely placed in § 48, was inadvertently omitted from § 49. See *People v Peltola*, 489 Mich 174, 185; 803 NW2d 140 (2011). Plaintiffs argue that the civil service carveout in § 48 was included because § 48 pertained only to public employees and that the omission of the carveout in § 49 is therefore of no significance because § 49 applies generally to public- and private-sector employees. How-

ever, the breadth of § 49 actually strengthens defendants' argument. The Legislature's authority to enact statutes relative to the conditions of employment for *all* employees, without distinguishing between the private and public sectors, negates any inference that the Legislature's authority applies equally to private and non-civil-service employment, with an implied and unstated exception for civil service employment.

The reference to "conditions of employment" in both Const 1963, art 4, § 49 and art 11, § 5 can be read consistently and without deviating from either section's plain language and without encroaching on or expanding the authority granted constitutionally to either the Legislature or the CSC. Const 1963, art 4, § 49 authorizes the Legislature to enact laws relative to the hours and conditions of employment generally, subject only to the CSC's authority to *regulate* conditions of employment in the classified civil service, in addition to performing other specifically enumerated duties. "Where as here, there is a claim that two different provisions of the constitution collide, we must seek a construction that harmonizes them both. This is so because, both having been adopted simultaneously, neither can logically trump the other." *Straus*, 459 Mich at 533 (citation and quotation marks omitted).

In its amicus curiae brief, the CSC extensively quotes the Official Record of the 1961 Constitutional Convention; the *Report of the Michigan Citizens Advisory Task Force on Civil Service Reform: Toward Improvement of Service to the Public, During the Decade of the '80's* (July 1979); and the *Citizen's Advisory Task Force on State Labor-Management Relations: Report to Governor James J. Blanchard* (September 1987). The CSC emphasizes that these historical sources reveal an intent to limit legislative oversight of the CSC. We agree that

these historical authorities reflect the framers' and ratifiers' intent to grant the CSC full authority over the areas of compensation, determination of qualifications, and other specifications of civil service employment. However, neither plaintiffs nor the CSC offers a satisfactory explanation of how Const 1963 art 4, § 49 can coexist with Const 1963, art 11, § 5 if the latter completely exempts the civil service from the former. The CSC argues that article 4, § 49 is a general provision, whereas article 11, § 5 is a specific provision and that specific provisions must control in a case relating to their subject matter. *Advisory Opinion on Constitutionality of 1978 PA 426*, 403 Mich 631, 639-640; 272 NW2d 495 (1978). The CSC's general/specific dichotomy, however, would be more accurately characterized as a broad/narrow dichotomy. The Legislature possesses the broad power to enact laws relative to the conditions of *all* employment, whereas the CSC possesses the narrow power to regulate conditions of civil service employment. The CSC's power to act in its limited sphere thus does not trump the Legislature's broader constitutional powers.

### D. CASES ADDRESSING THE AUTHORITY OF THE LEGISLATURE AND THE CSC

Our courts have recognized the broad and exclusive authority Const 1963, art 5, § 11 grants the CSC to govern the *internal conditions* of civil service employment. "The Civil Service Commission is a constitutional body possessing plenary power and may determine, consistent with due process, the procedures by which a state civil service employee may review his grievance." *Viculin*, 386 Mich at 393; see also *Dudkin v Civil Serv Comm*, 127 Mich App 397, 407; 339 NW2d 190 (1983) (concluding that the CSC could fashion rules with regard to agency shop fees at a time when such fees were permitted under a

former version of MCL 423.210(1)).[3] Our courts have also acknowledged that the CSC's power and authority are derived from the Constitution and that "its valid exercise of that power cannot be taken away by the Legislature." *Hanlon v Civil Serv Comm*, 253 Mich App 710, 717; 660 NW2d 74 (2002); see also *Crider v Michigan*, 110 Mich App 702, 723-724; 313 NW2d 367 (1981) (upholding the CSC's constitutional authority to impose periodic one-day layoffs to reduce payroll costs). However, the CSC's "powers are not unlimited." *Oakley v Dep't of Mental Health (On Remand)*, 136 Mich App 58, 62; 355 NW2d 650 (1984).

In *Council No 11*, our Supreme Court addressed a conflict between a statute, MCL 15.401 *et seq.* (1976 PA 169, the political freedom act), and a CSC rule restricting civil service employees' participation in political activities. *Council No 11*, 408 Mich at 390-391. The statute provided that a civil service employee had the right to join a political party committee authorized under state election laws, serve as a delegate to a political party's convention, and run for office without first obtaining a leave of absence from employment, while CSC Rule 7 prohibited such activities. *Id.* The plaintiff unions filed a complaint against the CSC on the ground that Rule 7 conflicted with 1976 PA 169 and Const 1963, art 11, § 5, which guaranteed freedom of expression rights. *Id.* at 391-392.

---

[3] Though plaintiffs rely on it, the Court in *Dudkin* did not address the issue raised here, namely, the CSC's authority to impose or permit agency shop fees under the catchall phrase "regulate all conditions of employment in the classified service" in Const 1963, art 11, § 5. At the time this Court decided *Dudkin*, MCL 423.210(1), as amended by 1973 PA 25, specifically permitted collective-bargaining agreements to require payment of a service fee as a condition of employment. Accordingly, *Dudkin* did not involve the conflict between the Legislature and the CSC presented here.

The Court held that the ratifiers of article 11, § 5 clearly did not intend to grant the CSC the power to abridge civil service employees' right to participate in the political process:

> We are persuaded that neither the history of the adoption of a civil service system in Michigan, including as it does the voice of the people expressed indirectly through the Legislature in 1937 and 1939 and directly in the 1940 constitutional amendment and the 1963 constitution, nor a common-sense reading of the "plain language" of art 11, § 5, interpreted according to familiar rules of constitutional construction, support the defendant's claim of authority to regulate, indeed prohibit, any off-duty political activity by state classified employees. [*Id.* at 403.]

After discussing the historical context of the 1940 amendment, the Court opined that the plain language of Const 1963, art 11, § 5, and "more precisely the meaning we think [the constitutional language] had for the people who adopted it," was of greater significance than the history of civil service in Michigan. *Id.* at 404-405 (emphasis omitted). Reviewing the rules of constitutional interpretation, the Court concluded that "[a] grant of power to an administrative agency to pervasively curtail the political freedoms of thousands of citizens should not be easily inferred from a constitutional provision so facially devoid of any such language." *Id.* at 406. The Court was unable to "conclude, with any degree of confidence, that 'the great mass of the people themselves would' understand the language of art 11, § 5, upon which defendants rely, to be a grant of power to defendants to forbid off-duty political activity." *Id.* The Court stated that interpreting the language of article 11, § 5 "as a grant of power to curtail political freedom of speech and association, at home, off-duty, would indeed assign the words used a 'dark [and] abstruse meaning'." *Id.* (alteration in original).

While the CSC has a grant of plenary power, "it is to be exercised with respect to determining the conditions '*of* employment', not conditions *for* employment." *Id.* The Court ruled that the CSC's power does not include the power to prohibit off-duty political activities. *Id.* at 407.

*Council No 11* resolved a direct conflict between a CSC rule and a legislative enactment, holding the legislation valid. Other cases have addressed the Legislature's power to enact laws applicable to all employees, including those in the classified civil service. In *Dep't of Civil Rights ex rel Jones v Dep't of Civil Serv*, 101 Mich App 295, 297-298; 301 NW2d 12 (1980), three female civil service employees filed complaints with the Michigan Department of Civil Rights alleging that the long-term disability insurance plan the Department of Civil Service offered to employees discriminated against women by denying disability benefits for disabilities related to pregnancy, childbirth, miscarriage, or abortion. After the Michigan Civil Rights Commission (CRC) determined that the disability plan violated the Fair Employment Practices Act, MCL 423.301 *et seq.*, and its successor statute, the Michigan Civil Rights Act, MCL 37.2102 *et seq.*, the Department of Civil Service filed an appeal in circuit court for de novo review. The circuit court reversed the CRC's order, concluding that the civil rights statutes did not apply to classified state employees. *Jones*, 101 Mich App at 298. On appeal, this Court rejected the argument that the CSC's plenary jurisdiction under article 11, § 5 precluded the CRC's jurisdiction over a civil rights dispute in the civil service. Citing *Council No 11*, 408 Mich 385, the Court noted that "the civil service's powers are not without limit." *Jones*, 101 Mich App at 300. The Court held that "[t]he establishment of the CRC expressed the intent of the people of Michigan to end invidious forms of discrimination through the efforts of a single commission" and

that the CRC's authority "to carry out its constitutional mandate to end discrimination" would be weakened if the CSC had exclusive jurisdiction over all employment concerns. *Id.* at 301.

In *Marsh v Dep't of Civil Service*, 142 Mich App 557, 559-560; 370 NW2d 613 (1985), the CSC denied the plaintiff's grievances for race, sex, and disability discrimination in promotion. The plaintiff filed suit in circuit court alleging violations of the Michigan Civil Rights Act and what was then called the Handicappers' Civil Rights Act (now the Persons with Disabilities Civil Rights Act), MCL 37.1101 *et seq. Id.* at 560. The circuit court dismissed the lawsuit on the ground that the CSC held exclusive subject-matter jurisdiction over the plaintiff's claims. *Id.* at 560-561. Similar to the position the CSC takes here, the Department of Civil Service argued that the antidiscrimination statutes did not apply to state employees in the classified state civil service because article 11, § 5 preempted and superseded any legislation governing employment conditions of civil service employees. *Id.* at 563. This Court adopted the reasoning that it employed in *Jones,* 101 Mich App 295. The Court in *Marsh* stated:

> Although Const 1963, art 4, § 48, precludes the Legislature from enacting laws providing for the resolution of employment disputes concerning public employees in the state classified civil service, this provision must be read in conjunction with the provision creating the Civil Rights Commission and the equal protection/antidiscrimination provision of our constitution. Provisions of the constitution should be read in context, not in isolation, and they should be harmonized to give effect to all. *Saginaw County v State Tax Comm,* 54 Mich App 160; 220 NW2d 706 (1974), *vacated on other grounds* 393 Mich 779; 224 NW2d 283 (1974), *aff'd sub nom Emmet County v State Tax Comm* 397 Mich 550; 244 NW2d 909 (1976). [*Marsh,* 142 Mich App at 566.]

At the heart of these cases is "the fact that the constitution expressly mandates the Legislature to implement constitutional provisions prohibiting discrimination and securing civil rights of all persons." *Dep't of Transp v Brown*, 153 Mich App 773, 781; 396 NW2d 529 (1986). Therefore, in addition to the fundamental constitutional principles articulated in *Council No 11*, defendants' position is supported by caselaw holding that laws of general application do not encroach on the CSC's jurisdiction when applied to civil service employees. In *Jones*, 101 Mich App 295, and *Marsh*, 142 Mich App 557, this Court held that the Civil Rights Commission held exclusive subject-matter jurisdiction over the plaintiffs' claims of employment discrimination arising under statutory civil rights laws and rejected the CSC's claim that the CSC held exclusive jurisdiction over employment disputes in the civil service.

Plaintiffs argue that these cases are not relevant because the decisions in *Jones* and *Marsh* were based on the constitutional authority of the Civil Rights Commission, which placed the Civil Rights Commission on equal footing with the CSC. Plaintiffs' argument misses the salient point, however, that the civil rights *statutes* enacted by the Legislature to ban workplace discrimination applied equally to civil service employees, notwithstanding the CSC's authority to "regulate all conditions of employment in the classified service." Const 1963, art 11, § 5. If the antidiscrimination statutes had encroached on the CSC's exclusive jurisdiction to regulate, it would not have been necessary for the Court to resolve the dispute over the proper forum for resolving disputes under the civil rights statutes.

Indeed, a wide array of statutes governing employment apply with equal force to private-sector and

public-sector employees, with no exception for civil service employees. See, e.g., the Worker's Disability Compensation Act, MCL 418.101 *et seq*. (stating in MCL 418.111 that "[e]very employer, public and private, and every employee, unless herein otherwise specifically provided, shall be subject to the provisions of this act and shall be bound thereby"), and the Michigan Employment Security Act, MCL 421.1 *et seq*. Availability of benefits to compensate injured workers and unemployed workers are part of employment conditions, and the statutes providing these benefits apply to civil service employees. Moreover, the Legislature has passed other laws related to hours and conditions of employment that affect private-sector, governmental, and classified civil service employees alike, including laws relating to licensing, public health, child labor, political freedoms, and occupational health and safety. Thus, while the CSC has the specific and plenary power to regulate conditions of employment, the Legislature has regularly exercised, and our courts have upheld, its broad constitutional authority to enact laws, including those affecting the hours and conditions of employment for classified civil service employees.

### E. THIS ISSUE IS UNIQUELY WITHIN THE PROVINCE OF THE LEGISLATURE

As discussed, our Constitution confers on the CSC the power to regulate conditions of employment in the classified civil service, and the Legislature has the authority to enact laws affecting conditions of employment. This leads to the specific question here, which is where agency fees fit within this "sharing" of constitutional responsibilities and whether the Legislature acted within its constitutional authority in enacting PA 349 as it pertains to the classified civil service. In further considering whether this is within the province

of the Legislature or the CSC, we must examine the nature of agency fees and what interests are affected by PA 349.

In the arena of public-sector employment, the government is, quite obviously, the employer. It is well settled that the government may not violate the free speech or free association rights of its citizens, and employees are citizens subject to protection. Further, the government, as employer, may not compel speech it favors or prohibit speech it disfavors by forcing employees to support or prohibiting employees from supporting ideological or political causes. To do so would violate the civil liberties and First Amendment rights of employees.

On the basis of these principles, it has long been the subject of litigation whether a governmental employer may require an employee to pay money to a union if the worker opposes the political or ideological views of the union. While various state and federal courts have questioned the constitutionality of agency fee provisions in the public sector, regardless of the merits of the underlying debate the question of their elimination is certainly one that implicates significant constitutional and public-policy questions. For more than 35 years, from *Abood v Detroit Bd of Ed*, 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), to *Knox v SEIU, Local 1000*, 567 US ___; 132 S Ct 2277; 183 L Ed 2d 281 (2012), the United States Supreme Court has reiterated that compulsory funding of unions by public-sector employees raises critical First Amendment concerns. The primary concern repeatedly advanced by nonunion plaintiffs in *Abood* and its progeny is that unions indisputably spend union dues on political and ideological causes with which employees may disagree. *Abood*, 431 US at 212-213. And as the *Abood* Court opined:

Our decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. *Equally clear is the proposition that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment.* [*Id.* at 233-234 (citations omitted) (emphasis added).]

Since *Abood*, the Supreme Court has endeavored to protect the First Amendment rights of governmental employees through the requirement of procedural safeguards from "compulsory subsidization of ideological activity." *Id.* at 237; see also *Chicago Teachers Union v Hudson*, 475 US 292; 106 S Ct 1066; 89 L Ed 2d 232 (1986).

Part of the law in this area is settled, and part remains in flux. What is settled is that a governmental employer cannot force a dissenting worker, as a condition of employment, to financially support political causes of the union. However, the governmental employer may require the employee to pay a fee for the union's costs for collective bargaining as long as the fee is not used to advance political or ideological causes to which the worker objects. The question that remains in contention is how a union accounts for that portion of an agency fee that is spent on constitutionally permissible collective bargaining versus unconstitutional expenditures on politics, how an employee may pursue the question of how fees are spent, and to what extent a union must reveal its expenditures. Those who oppose compulsory union fees assert that there is no adequate system to account for whether the fees are used only for collective bargaining and that, in reality, as a condition of remaining employed, employees must financially support political causes, which violates their First Amendment rights of free speech and political associa-

tion. Those who support mandatory agency fees contend that failing to require payments from each employee permits free riders who pay nothing for collective bargaining but enjoy the benefits of union-backed negotiations and that the methods used to determine how agency fees are spent interfere with union support of political and other causes, thus infringing on their rights of free speech and association.

Michigan has decided to leave the fray. With PA 349, the Legislature has made all contributions to public-sector unions voluntary, thus removing political and ideological conflict from public employment and eliminating the repeated need to decide, on a case-by-case basis, whether unions have properly allocated funds. The government as employer may no longer require public employees to pay money to unions whose politics or ideological causes the employees oppose, and, at the same time, unions will no longer have to be wary of potential challenges to their financial contributions and may spend voluntary member dues as they see fit, without governmental oversight.

Importantly, the very reason the people adopted Const 1963, art 11, § 5 was to provide for a merit-based system of governmental hiring and employment, eliminate politics, and provide for an apolitical body to regulate issues regarding employee qualifications, promotion, and pay, which are matters completely outside the substance and application of PA 349. Further, as discussed, if agency fees are a condition of employment, as plaintiffs suggest, they are also, undoubtedly, a condition *for* employment when an employee may be terminated for failure to pay. In *Council No 11*, our Supreme Court made clear that the CSC may regulate conditions *of* employment, not conditions *for* employment, which are matters for the Legislature. *Coun-*

*cil No 11*, 408 Mich at 406. Thus, the elimination of compulsory agency fees was well within the Legislature's authority. Further, because the United States Supreme Court has long held that agency fees implicate governmental employees' constitutional rights and important questions of public policy, the principle applies with equal force that matters like the one at issue here are within the province of the Legislature:

> The power, indeed the duty, to protect and insure the personal freedoms of all citizens, including the rights of free speech and political association, is reposed in the Legislature as one of the three co-equal branches of government by art 1 of the Michigan Constitution. The enactment of laws designed to assure the protection and enhancement of such rights is therefore a particularly proper legislative concern. [*Id.* at 394-395.]

And beyond the constitutional concerns implicated by the imposition of agency fees by governmental employers and unions, as a matter of public policy the decision whether to continue the practice is also within the Legislature's power. As the United States Supreme Court explained in *Abood*:

> Congress, acting within its constitutional powers, has the final say on policy issues. If it acts unwisely, the electorate can make a change. The task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which Congress exercises. [*Abood*, 341 US at 225 n 20.]

Accordingly, we hold that, contrary to plaintiffs' claim, it is within the authority of the Legislature to pass laws on public-policy matters in general and particularly those, as here, that unquestionably implicate constitutional rights of both union and nonunion public employees. The language of Const 1963, art 11, § 5, the history of civil service laws in the state of Michigan, and the

language of Const 1963, art 4, §§ 48 and 49 do not preclude the Legislature from enacting PA 349 and applying this statute to the classified civil service. The CSC's power to regulate civil service employment does not infringe on the legislative power under article 4, § 49 to enact laws relative to conditions of employment, and applying those laws toward all employment in the state, public and private, civil service or not civil service. Finally, Michigan caselaw fully supports the principle that the Legislature, as the policymaking branch of government, has the power to pass labor laws of general applicability that also apply to classified civil service employees. For these reasons, we hold that 2012 PA 349 is constitutional as applied to classified civil service positions in Michigan.

## IV. RESPONSE TO THE DISSENT

Respectfully, our dissenting colleague gives the impression that agency fees are akin to CSC rules requiring a certain educational degree for promotion, specifying procedures for drafting qualifying examinations, or establishing job performance ratings. If that were true, there would be no demonstrations in Lansing or, indeed, across the country about the very nature of the fees at issue and the myriad constitutional and public-policy questions that flow from their imposition or abolishment. Importantly, our holding does not seek to devalue, avoid, or undermine the power of the CSC as the dissent would suggest. Rather, while recognizing the complexity of the issue before us, we acknowledge that, in varying ways, both the CSC and the Legislature have authority over the welfare of Michigan employees but, on this particular issue, we hold that the decision whether public-sector employees, including those in the

classified civil service, must pay fees to unions is within the Legislature's scope of authority.

The dissent relies on quotations about the CSC's authority in support of the notion that the CSC "reigns supreme" in all aspects of civil service employment, but the quotations are dicta and the cases are simply inapposite. The dissent cites *Dudkin* as a "particularly pertinent case" regarding the CSC's authority but, as the Court itself explained, the issue in *Dudkin* was whether the CSC *"failed to follow its own rules and regulations* in promulgating a rule permitting negotiation of an agency shop fee with the union." *Dudkin*, 127 Mich App at 401 (emphasis added). The case arose when the CSC unilaterally changed a rule to dispense with its own requirement that a majority of employees must agree before an agency fee could be imposed. *Id.* at 401-403. This Court held that the CSC's own rules did not require the CSC to notify each employee about rule changes and that the new rule did not violate the CSC's obligations under article 11, § 5. *Id.* at 406-407. The panel noted that the imposition of agency fees was upheld in *Abood* and observed that designating a union and imposing "an agency shop fee clearly bears on the efficiency of civil service operations." *Id.* at 408-409.

The dissent's reliance on *Dudkin* is misplaced because not only is it not binding on this Court under MCR 7.215(J)(1), the law has since changed. *Dudkin* was decided at a time when our Legislature explicitly permitted governmental employers and unions to impose agency fees on public employees under the former version of MCL 423.210(1), but this is no longer the law. *Dudkin* was also decided before the United States Supreme Court established the procedural safeguards in *Hudson*, which not only supersede any civil service rule to the contrary, but also include notice require-

ments for the collection of fees from nonunion employees, specifically to avoid infringement of their constitutional rights. *Hudson*, 475 US at 303. Moreover, *Dudkin* did not address, much less decide, a dispute over the rulemaking power of the CSC and the lawmaking power of the Legislature that would, in any way, answer whether the Legislature's enactment of PA 349 applies to classified civil service employees.

The same holds true of *Crider*, 110 Mich App 702. Because of a state financial crisis, and to avoid long-term layoffs, in *Crider* the CSC bypassed its own rules and enacted a new rule permitting layoffs for classified employees who were not performing immediate essential public services and who were not covered by contrary collective-bargaining agreements. *Id.* at 708-709. Michigan State Police command officers sued the CSC and argued that the CSC exceeded its powers under article 11, § 5. *Id.* at 710, 714-715. This Court ruled that the CSC had the authority to temporarily suspend its own rules and regulations in an emergency financial situation and that, pursuant to its authority to regulate conditions of employment, the CSC could impose a layoff program for certain classified employees. *Id.* at 723-730.

*Crider* did not involve agency fees or legislation conflicting with a CSC rule, and it appears that the dissent cites it, along with *Dudkin*, in a search for any available language stating that the CSC has broad constitutional powers. We do not dispute the cited language or the point that the CSC has extensive power within its scope of authority, but the dissent seems unable to tolerate the notion that *both* the CSC and the Legislature have constitutional authority over public-employment matters. Indeed, notably absent from the dissenting opinion is an acknowledgement of the many

Michigan appellate decisions upholding legislative "incursion" into what the dissent describes as the CSC's constitutional "domain." The Legislature has enacted various laws that apply to all Michigan employees, including those in the classified civil service, related to equal protection, antidiscrimination, civil rights, disability rights, political freedom, occupational health and safety, and others.[4] Again, as the opinion states, we recognize the authority of both the CSC and the Legislature and, while the dissent declines to do the same, the critical and difficult question here is the nature of the matter at issue and whether it falls within the province of the Legislature or the CSC.

In addition to its denial of any overlapping or shared authority, it appears that the dissent underplays the importance of agency fees on the basis of its fundamentally erroneous view that our courts have "resoundingly" decided that agency fees do not burden the exercise of First Amendment rights. To the contrary, as the United States Supreme Court made clear in *Knox*,

[4] See *Council No 11*, 408 Mich 385; *Marsh*, 142 Mich App 557; *Jones*, 101 Mich App at 301, 304 (holding that the Civil Rights Commission has jurisdiction over discrimination claims brought by classified civil service employees and that the Department of Civil Service's failure to provide benefits violated the antidiscrimination provisions of the Fair Employment Practices Act and the successor Civil Rights Act); *Brown*, 153 Mich App at 782 ("In light of Const 1963, art 4, § 51, which directs the Legislature to protect and promote public health for all persons, we conclude that the prohibition of legislation for resolution of employment disputes of classified civil service employees does not extend to the area of occupational health and safety.") (citation omitted); *Civil Serv Comm v Dep't of Labor*, 424 Mich 571, 625; 384 NW2d 728 (1986) ("[T]he power of the Civil Service Commission to 'regulate all conditions of employment in the classified service' does not preclude the Legislature from eliminating a position once it is classified as within the civil service system."); *Walters v Dep't of Treasury*, 148 Mich App 809, 815; 385 NW2d 695 (1986) ("[T]he state, its subdivisions and agencies are 'employers' covered by the [Civil Rights Act].").

[w]hen a State establishes an "agency shop" that exacts compulsory union fees as a condition of public employment, "[t]he dissenting employee is forced to support financially an organization with whose principles and demands he may disagree." *Ellis* [*v Brotherhood of Railway, Airline & Steamship Clerks*, 466 US 435, 455; 104 S Ct 1883; 80 L Ed 2d 428 (1984)]. Because a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences, . . . the compulsory fees constitute a form of compelled speech and association that imposes a "significant impingement on First Amendment rights." [*Id.*] Our cases to date have tolerated this "impingement," and we do not revisit today whether the Court's former cases have given adequate recognition to the critical First Amendment rights at stake. [*Knox*, 567 US at ___; 132 S Ct at 2289.]

Thus, in direct opposition to the dissent's assertion, the Supreme Court has explicitly declared that agency fees impose a "significant" burden on "critical" First Amendment rights. *Id.* at ___; 132 S Ct at 2289. That fact has been decisively established. What remains in continual litigation is how to determine when agency fees are spent on matters not germane to purposes of collective bargaining, how to protect the constitutional rights of those employees who oppose funding speech on political or ideological matters the union espouses, and how to also protect the constitutional rights of employees who wish to join unions and support those views. That is, since *Abood*, our courts have repeatedly grappled with questions about which public-sector union expenses are chargeable to nonmembers, which are nonchargeable, and how employees may vindicate their rights.[5]

---

[5] *Knox*, 567 US ___; 132 S Ct 2277; *Davenport v Washington Ed Ass'n*, 551 US 177; 127 S Ct 2372; 168 L Ed 2d 71 (2007); *Air Line Pilots Ass'n v Miller*, 523 US 866; 118 S Ct 1761; 140 L Ed 2d 1070 (1998); *Lehnert v Ferris Faculty Ass'n*, 500 US 507; 111 S Ct 1950; 114 L Ed 2d 572 (1991);

In light of the First Amendment rights at stake, the Michigan Legislature has made the policy decision to settle the matter by giving all employees a right to choose. This is quite the opposite of "advanc[ing] a political agenda" as described by the dissent; to the contrary, it is a decision to further remove politics from public employment and to end all inquiry or debate about how public-sector union fees are spent. Again, at issue here is whether our Legislature may prohibit agency fees for classified civil service employees when a civil service rule permits them. The CSC is an agency created to ensure a merit system in public employment and abolish political cronyism in hiring and promotion, which it does through rules regarding matters such as pay grades, conditions for promotion, and dispute resolution. A legislature in a representative constitutional republic speaks for the people on matters of significant public concern. Our conclusion, as fully set forth in this

---

*Hudson,* 475 US 292; *Abood,* 431 US 209; *Merritt v Int'l Ass'n of Machinists & Aerospace Workers,* 613 F3d 609 (CA 6, 2010); *Scheffer v Civil Serv Employees Ass'n,* 610 F3d 782 (CA 2, 2010); *Locke v Karass,* 498 F3d 49 (CA 1, 2007); *Cummings v Connell,* 402 F3d 936 (CA 9, 2005); *Otto v Pennsylvania State Ed Ass'n-NEA,* 330 F3d 125 (CA 3, 2003); *Wessel v City of Albuquerque,* 299 F3d 1186 (CA 10, 2002); *Shea v Int'l Ass'n of Machinists & Aerospace Workers,* 154 F3d 508 (CA 5, 1998); *Abrams v Communications Workers of America,* 313 US App DC 385; 59 F3d 1373 (1995); *Dashiell v Montgomery Co,* 925 F2d 750 (CA 4, 1991). Further, while the United States Supreme Court has thus far declined to rule agency fees unconstitutional per se, it is clear that a "union's 'collection of fees from nonmembers is authorized by an act of legislative grace' . . . ." *Knox,* 567 US at ___; 132 S Ct at 2291 (citation omitted.) And a state legislature clearly has the constitutional right to make the policy decision to abolish the requirement of union membership and prohibit compulsory agency fees. *Davenport,* 551 US at 184; *Lincoln Fed Labor Union v Northwestern Iron & Metal Co,* 335 US 525; 69 S Ct 251; 93 L Ed 2d 212 (1949). Moreover, though the dissent wrongly urges that it makes no difference whether agency fees constitute a condition "of" employment or "for" employment, again, our Supreme Court stated otherwise in *Council No 11,* 408 Mich at 406.

opinion, is premised on the authoritative boundaries of the Legislature and the CSC as defined in our Constitution, but the dissent begs further comment on the effect of its position. By enacting PA 349, the Legislature made a choice and thereby spoke for the people of Michigan. A subsequent, duly elected Legislature may decide that PA 349 is contrary to the will of the people and can change the law or, if dissatisfied, citizens themselves may reject PA 349 through referendum or propose a new law through initiative. Simply stated, it would strip this power away from the people and eliminate their collective voice on a matter of constitutional importance were we to accept the dissent's view that four unelected, unaccountable members of an executive agency have the authority to decide the matter, outside the public arena, when the Constitution gives that agency no such power. While we do not question the CSC's authority within the limited scope set forth by the people in our Constitution, *Viculin*, 386 Mich at 393, for the reasons set forth in the opinion, we hold that the Legislature has the authority to enact legislation with regard to agency fees and that the legislation, 2012 PA 349, applies to employees in the classified state civil service.

DONOFRIO, J., concurred with SAAD, P.J.

GLEICHER, J. (*dissenting*). Article 11, § 5 of the 1963 Michigan Constitution establishes the Civil Service Commission (CSC) as an independent constitutional entity and broadly empowers the CSC to govern the classified state civil service. A comment in the Address to the People explained that the CSC's constitutional framework was "designed to continue Michigan's national leadership . . . in public personnel practice, and to foster and encourage a career service in state govern-

ment." 2 Official Record, Constitutional Convention
1961, p 3405. An integral component of article 11, § 5
vests the CSC with the authority to "make rules and
regulations covering all personnel transactions, and
regulate all conditions of employment in the classified
service."

Pursuant to its regulatory authority, the CSC autho-
rizes "employees in eligible positions to engage in a
form of collective bargaining . . . ." Civ Serv R 6-1.1.
Eligible classified employees "may organize, form, as-
sist, join, or refrain from joining labor organizations."
Civ Serv R 6-5.1. If a union-eligible employee opts out of
union membership, Civ Serv R 6-7.2 permits the CSC to
collect from the employee a service fee, also called an
agency fee.[1] Agency fees defray the costs associated with
collective bargaining and other union activities.

2012 PA 349 (PA 349) amended the public employ-
ment relations act (PERA), in part prohibiting public
employers from requiring union membership and as-
sessing agency fees against nonunion employees. The
issue presented in this declaratory judgment action is
whether PA 349's agency-fee provision applies to the
classified civil service.

The majority holds that because article 4, § 49 of the
1963 Michigan Constitution permits the Legislature to
"enact laws relative to the hours and conditions of
employment," PA 349 trumps the CSC's agency-fee
rule: "the CSC's power to issue rules governing civil

---

[1] Specifically, the rule provides:

    Nothing in this rule precludes the employer from making an
agreement with an exclusive representative to require, as a
condition of continued employment, that each eligible employee in
the unit who chooses not to become a member of the exclusive
representative shall pay a service fee to the exclusive representa-
tive. [Civ Serv R 6-7.2.]

service employment is not limitless in scope, but is subject to and in accordance with the Legislature's power to 'enact laws' regarding 'conditions of employment.'" Despite the expansive rulemaking power vested in the CSC by article 11, § 5, the majority asserts that "it is within the authority of the Legislature to pass laws on public-policy matters in general and particularly those, as here, that unquestionably implicate constitutional rights of both union and nonunion public employees."

I believe that 2012 PA 349 unconstitutionally infringes on the CSC's power to "regulate all conditions of employment in the classified service." Const 1963, art 11, § 5. That agency fees may "implicate" constitutional rights does not empower the Legislature to exceed its constitutional authority. Therefore, I respectfully dissent.

I. THE CONSTITUTIONAL FRAMEWORK

Const 1963, art 11, § 5 describes the scope of the classified civil service, establishes the CSC's powers, and invests the CSC with regulatory independence. Its 12 paragraphs elucidate the CSC's unique, autonomous role in our constitutional system. The Constitution's framers anticipated that the CSC would remain detached from partisanship ("The civil service commission shall be non-salaried and shall consist of four persons, not more than two of whom shall be members of the same political party, appointed by the governor for terms of eight years, no two of which shall expire in the same year."). Promotion or appointment in the civil service hinges on merit rather than "religious, racial or partisan considerations." Compensation increases recommended by the CSC may be rejected only upon a ⅔ vote of "the members elected to and serving in each

house . . . ." The Legislature's power to limit the CSC's own budget is also substantially constrained ("To enable the commission to exercise its powers, the legislature shall appropriate to the commission for the ensuing fiscal year a sum not less than one percent of the aggregate payroll of the classified service for the preceding fiscal year, as certified by the commission."). These elements of article 11, § 5 animate the framers' intent to shield this State's skilled, loyal, high quality work force from politically motivated meddling.

The 1963 Constitution established the CSC's unique independence to ensure that the political preferences of the Governor or the Legislature would not infect the administration of the classified work force. Article 11, § 5 deliberately insulates the management of the classified civil service from political partisanship. The majority's acknowledgment that PA 349's substance has engendered "demonstrations in Lansing [and], indeed, across the country" confirms the fundamentally *political* nature of the statute and decisively contradicts the majority's claim that the Legislature acted merely to "remove politics from public employment."

The fourth paragraph of article 11, § 5 is at the center of this dispute. This provision enables the CSC to wield the comprehensive authority bestowed upon it by the Constitution:

> The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, *make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.* [Emphasis added.]

The CSC's prerogative to allow the assessment of agency fees flows from this delegation of regulatory power.

The majority asserts that PA 349 constitutes a "proper exercise of the Legislature's constitutional authority" because it embodies a law relative to the hours and conditions of employment. Furthermore, the majority reasons, the statute falls "uniquely within the province of the Legislature" because the Legislature possesses " '[t]he power, indeed the duty, to protect and insure the personal freedoms of all citizens, including the rights of free speech and political association . . . .' " Quoting *Council No 11, AFSCME v Civil Serv Comm*, 408 Mich 385, 394; 292 NW2d 442 (1980).

In my view, the majority misapprehends the Legislature's constitutional role, disregards the plain language of Const 1963, art 11, § 5, and ignores basic separation-of-powers principles.

## II. THE LEGISLATURE'S CONSTITUTIONAL ROLE

The majority's first fundamental error casts the Legislature as the branch of government "uniquely" assigned by the Constitution to ascertain the constitutional merits and demerits of the CSC's agency-fee rule. Whether agency fees actually violate First Amendment rights is first and foremost a legal question. The judicial branch has resoundingly answered that question in the negative. No less an authority than the United States Supreme Court has repeatedly reaffirmed that a state employer may require the payment of agency fees as long as the union uses the fees for nonideological, nonpolitical collective-bargaining activity. *Lehnert v Ferris Faculty Ass'n*, 500 US 507; 111 S Ct 1950; 114 L Ed 2d 572 (1991); *Chicago Teachers Union v Hudson*, 475 US 292; 106 S Ct 1066; 89 L Ed 2d 232 (1986);

*Abood v Detroit Bd of Ed*, 431 US 209; 97 S Ct 1782; 52
L Ed 2d 261 (1977).[2] Public-sector agency fees devoted
to collective-bargaining purposes are wholly unobjec-
tionable from a First Amendment standpoint. Indeed,
none of the parties in this case has even hinted that the
CSC's agency-fee rule improperly imposes charges used
for political activity or that the rule conflicts in any
manner with the First Amendment. This salient fact
reinforces that the Legislature's decision to abolish
mandatory agency fees rests solely on a political calcu-
lus born of a dislike for unions rather than a First
Amendment analysis. Cloaking PA 349 in "right to
choose" garb cannot disguise that its purpose is to
interfere with the CSC's judgment that agency fees
serve a positive, productive purpose in the classified
work force.

This case does not involve a substantive challenge to
the CSC's agency-fee rule. Rather, the Legislature's
ability to abolish agency fees in the civil service must be
measured against the Legislature's constitutional au-
thority to make a different political choice than that
made by the CSC. Accordingly, whether regulation of

---

[2] Notably *Abood* and *Lehnert* involved the constitutionality of previous
versions of PERA. In *Abood*, the United States Supreme Court generally
upheld the constitutionality of PERA's agency-shop provision. In *Leh-
nert*, the United States Supreme Court considered the constitutionality of
PERA's compulsory agency fees. The Court held in part that "a local
bargaining representative may charge objecting employees for their pro
rata share of the costs associated with otherwise chargeable activities of
its state and national affiliates, even if those activities were not per-
formed for the direct benefit of the objecting employees' bargaining
unit." *Lehnert*, 500 US at 524. More recently, the Supreme Court held
that public-sector unions may collect agency fees as long as the unions
observe various procedural requirements "to ensure that an objecting
nonmember can prevent the use of his fees for impermissible purposes."
*Davenport v Washington Ed Ass'n*, 551 US 177, 181; 127 S Ct 2372; 168
L Ed 2d 71 (2007).

agency fees falls within the province of the Michigan Legislature depends on the manner in which the Michigan Constitution separates and delegates power. Our Constitution disperses the powers of government and limits their exercise pursuant to article 3, § 2: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." "Because the [CSC's] grant of power is derived from the constitution, its valid exercise of power cannot be taken away by the Legislature." *Livingston Co Bd of Social Servs v Dep't of Social Servs*, 208 Mich App 402, 408; 529 NW2d 308 (1995).

Thus, the Legislature's interest in vindicating the First Amendment rights of certain classified civil servants remains subject to the Legislature's constitutional ability to exercise its lawmaking authority in the CSC's field. I believe that the Legislature lacks the power to advance a political agenda by intruding on the constitutional prerogatives expressly reserved to the CSC by Const 1963, art 11, § 5. That the civil service rule admits of no First Amendment infirmity reinforces my conclusion.

Agency fees subsidize collective bargaining. The CSC has determined that collective bargaining enhances the employment conditions of its work force. Because this judgment comports with the CSC's constitutional authority to "regulate all conditions of employment" applicable to the classified civil service, Civ Serv R 6-7.2 constitutes a legitimate exercise of the CSC's power.[3] By

---

[3] To borrow the majority's term, any incursion into the CSC's collective-bargaining rules also "implicates" article 4, § 48, which permits the Legislature to pass laws "providing for the resolution of disputes concerning public employees, *except those in the state classified civil*

overriding the CSC's judgment concerning the need for agency fees, the Legislature has unconstitutionally usurped the CSC's constitutionally granted rulemaking authority. I would hold that Const 1963, art 11, § 5 divests the Legislature of the power to impose the agency-fee restrictions contained in 2012 PA 349 on the classified civil service.

### III. THE CSC'S CONSTITUTIONAL ROLE

The CSC's establishment as a constitutional entity reflects a purposeful determination that the CSC would possess "plenary and absolute powers in its field." *Viculin v Dep't of Civil Serv*, 386 Mich 375, 393, 398; 192 NW2d 449 (1971). Consequently, the Legislature is "without power to regulate the internal procedures of the [CSC] and this fact is recognized in Const 1963, art 4, § 48[.]" *Id.* at 393.

The Supreme Court and this Court have repeatedly reiterated that Michigan's Constitution confers on the CSC expansive and exclusive authority to regulate the workings of the classified civil service. "We do not question the [CSC's] authority to regulate employment-related activity involving *internal matters* such as job specifications, compensation, grievance procedures, discipline, *collective bargaining* and job performance, including the power to prohibit activity during working hours which is found to interfere with satisfactory job performance." *Council No 11*, 408 Mich at 406 (emphasis added). Const 1963, art 11, § 5 contemplates an autonomous administrative agency vested with "absolute power in its field." *AFSCME Council 25 v State*

*service.*" (Emphasis added). Agency-fee rules "implicate" collective bargaining and the dispute resolution process created by the CSC. These "implications" supply separate grounds for holding PA 349 unconstitutional.

*Employees' Retirement Sys*, 294 Mich App 1, 15; 818 NW2d 337 (2011). And "[b]ecause the CSC's power and authority is derived from the constitution, its valid exercise of that power cannot be taken away by the Legislature." *Hanlon v Civil Serv Comm*, 253 Mich App 710, 717; 660 NW2d 74 (2002).

In *Council No 11*, the Supreme Court considered "a conflict between the rule-making power of the [CSC] and the law-making power of the legislature . . . ." *Council No 11*, 408 Mich at 390. Specifically at issue were a civil service rule prohibiting classified civil servants from engaging in political activities both on- and off-duty and a statute generally permitting political activity. *Id.* at 390-391. The Supreme Court held that the CSC's rulemaking power did not extend to "the blanket prohibition of off-duty activities," observing that "[w]hat an employee does during his off-duty hours is not of proper concern to the [CSC] unless and until it is shown to adversely affect job performance." *Id.* at 407. Thus, the Court upheld the constitutionality of a statute permitting members of the classified civil service "to enjoy the exercise of freedom of speech and expression involved in off-duty political activity, including running for public office . . . ." *Id.* at 393-394, 409.

Notwithstanding this rebuke of the CSC, the Supreme Court emphatically underscored the CSC's supremacy in its constitutionally assigned field:

> We do not wish to be understood as qualifying in any way this Court's earlier holding that
>
>> the Civil Service Commission by [the constitutional grant of authority] is vested with plenary powers *in its sphere of authority.* (Emphasis added.) *Plec v Liquor Control Comm*, 322 Mich 691; 34 NW2d 524 (1948).
>
>> Since that grant of power is from the Constitution, any executive, legislative or judicial attempt at incursion into

that "sphere" would be unavailing. We intend, rather, to be understood as emphasizing that the commission's "sphere of authority" delimits its rule-making power and confines its jurisdiction over the political activity of classified personnel to on-the-job behavior related to job performance. [*Id.* at 408.]

While *Council No 11* does not countenance curtailing a civil servant's civil right to engage in off-duty political activity, that case nowhere even hints that the Legislature may interfere with the CSC's authority to regulate on-duty employment concerns.[4]

This Court has repeatedly rebuffed challenges to the CSC's authority to perform its constitutional function. In one particularly pertinent case, *Dudkin v Civil Serv Comm*, 127 Mich App 397, 408; 339 NW2d 190 (1983), this Court examined whether Const 1963, art 11, § 5 prohibited "discharge for failure to pay any agency shop fee because civil service employment is to be governed strictly on merit principles." This Court unqualifiedly confirmed that the CSC's power encompassed the ability to regulate agency-shop fees:

> Designation of an exclusive representative and imposition of an agency shop fee clearly bears on the efficiency of civil service operations. The [CSC] has reserved the right to promulgate "such additional rules as it may deem neces-

---

[4] Citing *Council No 11*, the majority observes that the CSC's agency-fee rule serves as both a "condition of" and a "condition for" employment and asserts that "the CSC may regulate conditions *of* employment, not *for* employment . . . ." No authority supports that the CSC lacks the ability to regulate a condition "of" employment that concomitantly qualifies as a condition "for" employment, regardless of the inapplicable dicta in *Council No 11*. Job qualification requirements (for example, licensure in a certain field) constitute conditions "of" and "for" continued employment. Continuing-education requirements or certain minimal exam scores qualify as conditions "of" and "for" employment. That these conditions "of" employment overlap conditions "for" employment hardly renders them illegal usurpations of power.

sary to insure the effective and orderly operation of the meet and confer system established by these regulations". The director has general authority to issue other employee relations regulations consistent with the rules. . . .

*Finally, imposition of agency shop fees on non-union members has been upheld in the public employee context. [Abood, 431 US 209]; Eastern Michigan Univ Chapter of American Ass'n of Univ Professors v Morgan, 100 Mich App 219; 298 NW2d 886 (1980).*

*We conclude that the [CSC] is constitutionally authorized to impose an agency shop fee pursuant to efficient civil service operations. [Dudkin,* 127 Mich App at 408-409 (emphasis added).][5]

*Crider v Michigan,* 110 Mich App 702, 723; 313 NW2d 367 (1981), further supports that in the realm of labor relations within the classified civil service, the CSC reigns supreme. The plaintiffs in *Crider* were laid off pursuant to "a statewide program of one-day lay-offs." *Id.* at 706. The CSC exempted from layoff those employees "covered by [a previously existing] collective bargaining agreement limiting the right to lay off." *Id.* at 709 (quotation marks and citation omitted; emphasis omitted). This Court found no merit in a host of challenges to this civil service rule, including that it "violate[d] the right to equal protection of the employees laid off pursuant to it, and it violate[d] the employees' right to due process." *Id.* at 717. Fundamental constitutional principles united this Court's examina-

---

[5] The majority attempts to distinguish *Dudkin* on the basis that the CSC justified the fees by relying on the language "merit, efficiency and fitness" of Const 1963, art 11, § 5 rather than the language "regulate conditions of employment" plaintiffs now invoke. Respectfully, the majority has missed the forest for the trees. *Dudkin* stands for the proposition that the CSC may constitutionally make rules regarding agency fees. Whether that power derives from one phrase found in article 11, § 5 rather than another does not change the central fact that the CSC operates within its authority when imposing agency fees.

tion of the multiple, disparate issues it considered. For all of those issues, this Court set the analytical stage as follows: "A court of this state cannot substitute its judgment for that of an administrative board or commission acting within its duly granted powers. *Indeed, even the Legislature is without power to regulate the internal procedures of the CSC." Id.* at 716 (citation omitted; emphasis added). This Court elaborated:

> [G]iven the broad scope of the CSC's constitutional authority to regulate the compensation and working conditions of classified state employees, defendants correctly argue that the CSC's decisions regarding the compensation of covered employees are entitled to at least as much deference as decisions of other administrative commissions. This is particularly true in light of the above-quoted section of the state constitution [article 11, § 5] that gives the CSC great discretion over most, if not all, aspects of state civil service employment. [*Id.*]

These cases instruct that the CSC enjoys comprehensive regulatory prerogatives in the realm of the classified civil service. The CSC may adopt rules, fix rates of compensation, and generally control the conditions of employment for the civil service work force. And because the Constitution grants the CSC "plenary and absolute powers in its field," *Viculin*, 386 Mich at 398, the Legislature "cannot by statute usurp [the CSC's] constitutional authority," *Ins Comm'r v Mich State Accident Fund Advisory Bd*, 173 Mich App 566, 583; 434 NW2d 433 (1988).[6]

---

[6] Nor do *Dep't of Civil Rights ex rel Jones v Dep't of Civil Serv*, 101 Mich App 295; 301 NW2d 12 (1980), and *Marsh v Dep't of Civil Serv*, 142 Mich App 557; 370 NW2d 613 (1985), avail the majority's argument. Neither case involved a CSC rule regulating a "condition of employment." *Jones* involved a discriminatory long-term-benefit plan "made available" to classified employees. *Jones*, 101 Mich App at 297. *Marsh* applied the Civil Rights Act to the classified civil service, holding that the

IV. 2012 PA 349 AS APPLIED TO THE CLASSIFIED CIVIL SERVICE

The majority asserts that in enacting PA 349, the Legislature appropriately weighed in on a matter of constitutional import: "With PA 349, the Legislature has . . . remov[ed] political and ideological conflict from public employment and eliminate[ed] the repeated need to decide, on a case by case basis, whether unions have properly allocated funds." Because "agency fees implicate governmental employees' constitutional rights and important questions of public policy," the majority opines, "matters like the one at issue here are within the province of the Legislature[.]" Thus, the majority concludes, "it is within the authority of the Legislature to pass laws on public policy matters in general and particularly those, as here, that unquestionably implicate constitutional rights of both union and nonunion public employees."

In my view, the majority has lost sight of the principle that "[t]he Michigan Constitution is not a grant of power to the Legislature as is the United States Constitution, but rather, it is a limitation on general legislative power." *Advisory Opinion on Constitutionality of 1976 PA 240*, 400 Mich 311, 317-318; 254 NW2d 544 (1977). The Legislature may wield its power only in the manner prescribed by Michigan's Constitution. It may not infringe on a sphere of power belonging to another constitutional body. See *Federated Publications, Inc v Mich State Univ Bd of Trustees*, 460 Mich 75; 594 NW2d 491 (1999) (holding that while the Legislature has some power to control public universities, it may not interfere with those functions constitutionally placed under the

CSC's power to resolve employment disputes "does not extend to the area of employment discrimination." *Marsh*, 142 Mich App at 569. In neither case did the legislative enactment at issue clash with a civil service rule concerning the classified work force's conditions of employment.

universities' governance). Regardless of the Legislature's perception that the CSC's agency-fee rule is wrongheaded, the 1963 Constitution places "regula[tion of] all conditions of employment in the classified service" in the hands of the CSC. Const 1963, art 11, § 5. This limitation of power does not magically evaporate when the Legislature chooses to place its thumb on the scale in favor of a particular political preference. Nor does cloaking the Legislature's motives in civil-rights garb eliminate a separation-of-powers conflict.

Many employment matters "implicate" constitutional rights. For example, an employee's right to a full and fair termination procedure implicates the Due Process Clause. Arbitration clauses implicate the Seventh Amendment's right to jury trial. Whether a public-sector employee may be compelled to submit to drug testing implicates the Fourth Amendment. Antinepotism rules may implicate the constitutionally protected freedom to marry. The CSC could, and perhaps has, generated rules in all of these arenas. But that an employment rule promulgated by the CSC "implicates" or may "impact" an intact constitutional right does not authorize the Legislature to pass laws invading territory confined by the Constitution to an independent constitutional body. Michigan's Constitution carves out for the CSC *alone* the constitutional prerogative to "regulate all conditions of employment in the classified service."[7]

The majority minimizes the CSC's authority, asserting that despite the plain language of article 11, § 5, a different constitutional provision—Const 1963, art 4, § 49—"authorizes the Legislature to enact laws relative to the hours and conditions of employment generally,

---

[7] Should the CSC overstep constitutional bounds, the judicial branch may supply correction and a remedy.

subject only to the CSC's authority to *regulate* conditions of employment in the classified civil service, in addition to performing other specifically enumerated duties." According to the majority, the "collid[ing]" constitutional provisions invest "specific and plenary power" in the CSC "to regulate conditions of employment," while preserving for the Legislature the "broad constitutional authority to enact laws, including those affecting the hours and conditions of employment for classified civil service employees." 2012 PA 349, the majority insists, corresponds with the Legislature's authority to pass laws that "unquestionably implicate" constitutional rights.

"The public policy of this state as to labor relations in public employment is for legislative determination. The sole exception to the exercise of legislative power is the state classified civil service, the scheme for which is spelled out in detail in Article 11 of the Constitution of 1963." *Eastern Mich Univ Bd of Control v Labor Mediation Bd*, 384 Mich 561, 566; 184 NW2d 921 (1971). As explained in *Dudkin* and reemphasized here by amicus curiae CSC, efficient civil service operations justify the imposition of agency shop fees. One likely motivation for the CSC's policy choice is to avoid the resentment and hostilities generated by free riders. The 1963 Constitution makes it clear that the CSC's labor-relations judgments trump those of the Legislature, regardless of the reasons offered by the Legislature for drafting a "better" or "fairer" rule.

Accordingly, the majority's perceived "colli[sion]" between article 11, § 5 and article 4, § 49 must be resolved in favor of the CSC. A "fundamental rule of constitutional construction . . . requires this Court to construe every clause or section of a constitution consistent with its words or sense so as to protect and guard its

purposes." *In re Proposals D & H*, 417 Mich 409, 421; 339 NW2d 848 (1983). "[N]o court should so construe a clause or section of a constitution as to impede or defeat its generally understood ends when another construction thereof, equally concordant with the words and sense of that clause or section, will guard and enforce those ends." *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 393; 151 NW2d 797 (1967). Respect for each provision mandates affirmative recognition "that all constitutional provisions enjoy equal dignity." *Proposals D & H*, 417 Mich at 421.

"[T]he separation of powers doctrine does not require so strict a separation as to provide no overlap of responsibilities and powers." *Judicial Attorneys Ass'n v Michigan*, 459 Mich 291, 296; 586 NW2d 894 (1998). A specific, limited grant of authority to one branch "does not create encroachment or aggrandizement of one branch at the expense of the other . . . ." *Id.* at 297. When feasible, "a sharing of power may be constitutionally permissible." *Id.*

Application of these principles avoids a fatal collision. The Legislature enjoys a *general* mandate to "enact laws relative to the hours and conditions of employment," Const 1963, art 4, § 49, while the CSC alone regulates "all conditions of employment in the classified service," Const 1963, art 11, § 5. Thus, both entities share some authority to regulate "conditions of employment." As long as the Legislature's exercise of its power neither contradicts nor nullifies the CSC's regulation of a condition of employment, no conflict arises. However, when the Legislature passes a law directly clashing with a CSC work rule, it does so at its peril. The statute construed in *Council No 11* survived because it concerned a subject *outside* the CSC's jurisdiction. In contrast, legislative incursion into the CSC's constitu-

tional domain that transgresses the CSC's constitutional bailiwick is improper. To hold otherwise is to write out of the Constitution the regulatory authority of the CSC. Thus, the majority's pronouncement that the Legislature's authority includes enacting politically motivated laws contradicting civil service rules cannot be squared with separation-of-powers principles. The justness of the Legislature's cause does not alter its role in our constitutional system. Because PA 349 indisputably intrudes on the CSC's express power to "regulate all conditions of employment in the classified service," it is unconstitutional as applied to the classified civil service.[8]

The majority holds that Const 1963, art 4, § 49 authorizes the Legislature to override the CSC's authority whenever it finds a "public policy" justifying the displacement of a civil service rule. I submit that when the CSC acts to regulate conditions of employment in the classified civil service, the Legislature must respect the CSC's constitutional authority to make public-policy choices contrary to those preferred by the Legislature. And here, it cannot seriously be questioned that imposition of an agency fee constitutes a regulation of a condition of employment.

Citing the 2006 edition of *Merriam-Webster's Collegiate Dictionary*, the majority maintains that "the ordinary meaning of the word 'regulate' is to govern, direct, or control *according to rule, law or authority*." Although the majority's point is not altogether clear, it appears to reject that the CSC's agency-fee rule

---

[8] The majority acknowledges that "[t]he Legislature possesses the broad power to enact laws relative to the conditions of *all* employment, whereas the CSC possesses the narrow power to regulate conditions of civil service employment." If this specific power grant to the CSC must give way whenever the Legislature disagrees with the CSC's policy choice, article 11, § 5's empowerment of the CSC is purely illusory.

qualifies as a regulation of a condition of employ-
ment, adopting defendants' argument that the CSC's
regulatory authority is subservient to the Legisla-
ture's power to enact general laws concerning condi-
tions of employment.

I note preliminarily that the majority has not accu-
rately parsed its own dictionary source; it has blended
together alternative definitions to find a preferred
meaning.[9] Notwithstanding the majority's fictive defi-
nition, the dictionary gambit is inappropriate and un-
necessary. When construing the Constitution, we must
"discern the original meaning attributed to the words of
a constitutional provision by its ratifiers." *People v
Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004). Rather
than use dictionaries, "we apply the rule of 'common
understanding.' " *Id.* "In applying this principle of
construction, the people are understood to have ac-
cepted the words employed in a constitutional provision
in the sense most obvious to the common understand-
ing and to have 'ratified the instrument in the belief
that that was the sense designed to be conveyed.' " *Id.*
at 573-574, quoting 1 Cooley, Constitutional Limita-
tions (6th ed), p 81.

"Regulate" is such a commonly understood word that
dictionaries are superfluous. To regulate is simply to
control by rulemaking. This meaning of the term "regu-
late" guides my interpretation of the phrase "regulate
all conditions of employment in the classified service."
Const 1963, art 11, § 5. Simply put, the CSC may make
rules controlling the conditions of employment in the
classified civil service.

---

[9] The alternative definitions set forth in the majority's selected dictio-
nary source are "**1 a** : to govern or direct according to rule" and "**b** (1) :
to bring under the control of law or constituted authority." *Merriam-
Webster's Collegiate Dictionary* (11th ed, 2006), p 1049.

Nor is the phrase "conditions of employment" difficult to parse. In *Council No 11*, the Supreme Court identified as falling within the CSC's regulatory authority "job specifications, compensation, grievance procedures, discipline, *collective bargaining* and job performance . . . ." *Council No 11*, 408 Mich at 406 (emphasis added). Historically, Michigan has broadly interpreted a closely related phrase, "other terms and conditions of employment." *Central Mich Univ Faculty Ass'n v Central Mich Univ*, 404 Mich 268, 277; 273 NW2d 21 (1978).

Agency fees readily fall within the "all conditions of employment" rubric. The majority concedes this point by relying on article 4, § 49, which uses precisely the same phrase. In *Locke v Karass*, 555 US 207, 213; 129 S Ct 798; 172 L Ed 2d 552 (2009), the United States Supreme Court explained that "the First Amendment burdens accompanying the [agency-fee] payment requirements are justified by the government's interest in preventing freeriding by nonmembers who benefit from the union's collective-bargaining activities and in maintaining peaceful labor relations." In *Abood*, the Supreme Court similarly recognized that agency fees play an important role in labor peace by "distribut[ing] fairly" the cost of representational activities advantaging all employees while simultaneously "counteract[ing] the incentive that employees might otherwise have to become 'free riders'—to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees." *Abood*, 431 US at 222. In *Railway Employees' Dep't v Hanson*, 351 US 225, 234; 76 S Ct 714; 100 L Ed 1112 (1956), the Supreme Court reasoned that "[t]he ingredients of industrial peace and stabilized labor-management relations are numerous and complex. They may well vary from age to age and from industry to industry. What

would be needful one decade might be anathema the next. The decision rests with the policy makers, not with the judiciary." Michigan's Constitution appoints the CSC as the policymaker for the classified civil service.

The CSC has determined that agency fees foster harmonious labor relations. Civ Serv R 6-7.2 is fully consonant with the CSC's constitutional place in our system of divided powers. In my view, neither the majority nor the Legislature may cast aside the CSC's choice based on an alternative political preference. Rather than honoring the specific and exclusive delegation of power to the CSC in article 11, § 5, the majority's approach strips the CSC of its regulatory supremacy. Because agency fees constitute a condition of employment in the classified civil service, they are not subject to legislative elimination. I would hold that if applied to the civil service, PA 349 would transgress the CSC's constitutional authority to make rules governing all conditions of employment and respectfully dissent from the majority's contrary conclusion.