*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CLARKSTON EDUCATION ASSOCIATION
and MICHIGAN EDUCATION ASSOCIATION,

UNPUBLISHED
January 10, 2019

Respondents-Appellants,

v

No. 340470
MERC
Case No. 15-059437

RON CONWELL,

Charging Party-Appellee.

Before: SWARTZLE, P.J., and SAWYER and RONAYNE KRAUSE, JJ.

PER CURIAM.

In this labor dispute concerning a collective bargaining agreement (CBA), respondents Clarkston Education Association (CEA) and Michigan Education Association (MEA) (collectively, "respondents" or "the respondent unions") appeal as of right an order of the Michigan Employment Relations Commission (MERC). Among other things, MERC concluded that respondents had committed an unfair labor practice by attempting to enforce an unlawful collective bargaining provision against the charging party, teacher Ron Conwell of the Clarkston Community School District, which required Conwell to continue paying a "fair share" fee to the respondent unions after he resigned his membership in them. We affirm.

## I. FACTUAL BACKGROUND

This case arises out of actions that respondents took in response to 2012 PA 349, which is one of the public acts that are "commonly known as the 'Right to Work' laws[.]" See *UAW v Green*, 498 Mich 282, 284; 870 NW2d 867 (2015). Specifically, this case arises out of a memorandum of understanding (MOU) respondents entered into with the Clarkston Community School District (the District) in hopes that it would permit them to "grandfather" certain labor practices into both their extant and future CBAs before the effective date of 2012 PA 349, at which time such practices became unlawful.

On appeal, the parties do not contest any of MERC's stated factual findings or those of the administrative law judge (ALJ), which MERC adopted in whole. The order appealed aptly explained that

[t]he material facts in this matter are not in dispute.

Respondents were parties to a collective bargaining agreement (2012 [CBA]) covering September 1, 2012 through August 31, 2013. The 2012 [CBA] contained a union security clause providing that if a teacher failed to pay union dues or the service fee, the union president could request that the teacher's employment be terminated at the close of the school year, and the teacher would be dismissed in accordance with applicable law.

On December 11, 2012, the Michigan Legislature passed 2012 PA 349 (Act 349), which amended [the public employment relations act (PERA), MCL 423.201 *et seq*]. The changes to PERA included language expressly providing that public employees have a right to refrain from union activity. Other changes made union security clauses illegal for collective bargaining agreements affecting most public employees covered by PERA. Act 349 became effective March 28, 2013.

On March 21, 2013, [the District], Respondent Unions [i.e., respondents CEA and MEA], and two other MEA affiliates representing other bargaining units employed by [the District] entered into a memorandum of understanding (MOU) which provided:

> 1. [The District] and Union agree that *the agency or closed shop provisions ("Agency Shop") in the collectively bargained agreements between [the District] and the Union are hereby extended for a period not to exceed the term of the applicable, successor collectively bargained agreement but said extension, in each case, is contingent and conditioned upon ratification and execution of all successor collectively bargained agreements between [the District] and the Union by on or before midnight on June 15, 2013.* It is further acknowledged that [the District], at its option, may revoke and terminate Agency Shop in the event that any unit of Union is unable to observe the applicable deadline for ratification and execution of a successor collectively bargained agreement Union agrees that it will not legally challenge any such revocation or termination. The parties agree that this MOU does not constitute the settlement of or a successor to any collectively bargained agreement between [the District] and Union, that this MOU creates no binding precedent or past practice and that it does not establish a pattern of bargaining or constitute multiple unit bargaining, the multi-party nature of this MOU being for the mere convenience of the parties hereto.
>
> 2. In consideration of the [District] agreements contained in Paragraph 1 of this MOU, Union agrees that it shall, at its sole cost and expense and through counsel acceptable to [the District], defend and hold harmless [the District]. . . .

3. This MOU is effective upon ratification by the parties which will in no case be later than March 26, 2013 and *expires on June 30, 2016.*

On June 15, 2013, Respondents entered into a new collective bargaining agreement (2013 [CBA]) covering September 1, 2013 through August 31, 2014. The 2013 [CBA] included the agency shop language from the Respondents' 2012 [CBA]. On September 22, 2014, Respondents entered into a successor collective bargaining agreement (2014 [CBA]) containing the same agency fee language and covering the period from September 22, 2014 through August 31, 2015.

As explained in the ALJ's proposed decision:

On August 20, 2015, [charging party] Conwell sent a letter to the MEA resigning his union membership. Conwell also stated in his letter that the agency fee clause in the Respondents' collective bargaining agreement expiring on August 31, 2015, was illegal under Michigan's "Right to Work" law. Conwell went on to inform the Union that he expected immediate release from all obligations of membership and, if he could currently be lawfully compelled to pay union fees under Michigan law as a condition of his employment, that he invoked his rights under *Abood* [*v Detroit Bd of Ed*, 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), since overruled by *Janus v American Federation of State, Co, & Mun Employees, Council 31*, ___ US ___; 138 S Ct 2448; 201 L Ed 2d 924 (2018)]. Conwell received a reply from the MEA dated August 31, 2015, stating that it had accepted his resignation, but that he was "a member of a bargaining unit that has a collective bargaining agreement in effect which requires all members of the bargaining unit, as a condition of employment, to either be members of the Association [i.e., respondent unions] or to pay a fair share fee to the Association."

On or about September 1, 2015, Respondents entered into another collective bargaining agreement for the term September 1, 2015, through June 30, 2017. This agreement included the same agency fee clause as the previous agreements, but included a clause stating that the article was "null and void and of no further force and effect after June 30, 2016, in accordance with the Memorandum of Understanding between the District and the Association executed on March 21, 2013."

On October 8, 2015, Conwell's legal counsel sent a letter to the Respondents asserting that under the terms of the 2013 MOU, the new Right to Work Law fully applied to Conwell and other members of his bargaining unit the day after the successor agreement referenced in the first paragraph of the 2013 MOU expired. According to Conwell's counsel, this was September 1, 2014. The letter argued that the agency fee clauses in the [2014 CBA] and [2015 CBA] were therefore null and void from their inception because both agreements were entered into, and became effective, after the new Right to Work Law was applicable to Conwell's bargaining unit. Conwell's counsel stated that since

-3-

Conwell had paid all his membership dues for the 2014-2015 school year, he had no further obligation to pay union dues or fees to the Union. The letter alleged that the Union was violating Conwell's legal right to refrain from assisting a labor organization by "demanding that he owes a fair share fee," and that the Respondents had violated employees' rights by entering into collective bargaining agreements containing agency shop clauses in violation of the Right to Work law. The letter demanded that the Union cease and desist from attempting to enforce the agency shop clause, cease and desist from demanding payment of a fair share fee from Conwell, update its records to reflect that Conwell did not owe a fair share fee, and send Conwell written confirmation that he does not owe a fair share fee.

Neither Conwell nor his counsel received a response to the October 8 letter. On November 9, 2015, Conwell filed the instant charges. In December 2015, the MEA sent Conwell the packet of materials it sends annually to non-members covered by agency fee clauses. Along with information, the packet included a service fee election form that included three choices for employees who did not want to be union members: paying a service equal to the amount of dues less the cost of the liability insurance the MEA provides to its members, paying a Union-determined reduced service fee, and paying the reduced service fee and challenging the amount of the fee pursuant to the procedure described in the packet. The materials also directed Conwell to send a check or money order for the "pro rata amount due pursuant to the Service Fee Election Form Worksheet." The materials stated if the non-member did not submit the election form with a check or money order by January 19, 2016, he or she would be "required to pay a service fee equal to association dues less the pro rata cost of liability insurance." According to an affidavit by Conwell attached to his motion for summary disposition, he checked the box on the service fee election form stating that he wished to pay a reduced service fee in order to protect his right to pay only the reduced fee if he lost his unfair labor practice case. Conwell returned the service fee election form to the MEA but did not send money.

After Conwell instituted this action, respondents filed a joint motion seeking summary disposition. Conwell also moved for summary disposition. Ultimately, MERC ruled in Conwell's favor in all regards, and this appeal ensued.

## II. STANDARD OF REVIEW

As recently explained in *Calhoun Intermediate Sch Dist v Calhoun Intermediate Ed Ass'n*, 314 Mich App 41, 46; 885 NW2d 310 (2016):

We review MERC decisions pursuant to Const 1963, art 6, § 28, and MCL 423.216(e). MERC's factual findings are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole. MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and

material error of law. We review de novo MERC's legal rulings. [Quotations marks and citations omitted.]

## III. ANALYSIS

Respondents assert several claims of error on appeal. We examine each in turn.

## A. STATUTE OF LIMITATIONS

Respondents argue that MERC erred by concluding that Conwell's charges in this action were timely under the six-month limitations period provided by MCL 423.216(a). We disagree.

As this Court recently explained in *Saginaw Ed Ass'n v Eady-Miskiewicz*, 319 Mich App 422, 454; 902 NW2d 1 (2017) (*Eady-Miskiewicz*):

> But for an exception relating to persons serving in the armed forces, a person bringing an unfair-labor-practice charge before the MERC must do so within six months of the act engendering the charge. MCL 423.216(a). That limitation period "commences when the person knows of the act which caused his injury and has good reason to believe that the act was improper or done in an improper manner." *Huntington Woods v Wines*, 122 Mich App 650, 652; 332 NW2d 557 (1983). "[I]t is not necessary that the person recognize that he has suffered invasion of a legal right." *Id*. [Second alteration in original.]

The "continuing-wrongs" or "continuing violations" doctrine does not apply to unfair-labor-practice charges under MCL 423.216(a). *Eady-Miskiewicz*, 319 Mich App at 455. See also *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 290; 696 NW2d 646 (2005), amended on other grounds 473 Mich 1205 (2005) (holding that the continuing wrongs "doctrine has no continued place in the jurisprudence of this state"); *Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 286; 769 NW2d 234 (2009) (holding that *Garg* wrought "the complete abrogation of the continuing wrongs doctrine in the jurisprudence of this state").

Respondents do not contest MERC's finding that Conwell resigned from the respondent unions effective August 20, 2015. As MERC aptly noted, before that time, Conwell remained a dues-paying member of those unions. Thus, regardless of their legality, the agency-shop provisions in respondents' various CBAs, which required *non*members to nevertheless pay union fees as a condition of employment with the District, had no evident impact on Conwell before August 20, 2015. They certainly did not *harm* him in any direct fashion—if anything, they arguably benefitted him, requiring nonmembers to pay dues to support a union of which he was a member. Moreover, Conwell's charges in this action did not seek any ruling concerning the legality of the agency-shop provisions in the pre-2015 CBAs. Indeed, Conwell offered to file an amended charge, which had already been prepared, clarifying that point.

Because Conwell's instant charges regarded *only* harm to him arising out of the 2015 CBA's provisions and respondents' attempts, again in 2015, to enforce agency-shop provisions against Conwell, his charges in this matter were timely under MCL 423.216(a) when they were filed on November 9, 2015. Nor does this conclusion rest on an application of the now-defunct

-5-

"continuing wrongs" doctrine. At the earliest, Conwell's charges in this action accrued on August 31, 2015, i.e., when respondents notified him that, despite his resignation, his continued employment with the District was conditioned on his *prospective* payment of "a fair share fee" to the respondent unions. Until such time, even if Conwell was fully aware of the terms of the MOU and the then-existing CBAs, he had no reason to know that, despite the enactment of 2012 PA 349, respondents would insist—unlawfully, as discussed later—on his post-resignation payment of a *new* sort of fee to the union that he had not been responsible for paying when he was a dues-paying member. In other words, August 31, 2015, is the first date that Conwell received notice both of "the act which *caused* his injury" and that said "act was improper or done in an improper manner." See *Eady-Miskiewicz*, 319 Mich App at 454 (quotation marks and citation omitted; emphasis added).

## B. STANDING

Respondents argue that MERC erred by holding that Conwell had standing to assert the unfair-labor-practice charges at issue here. We again disagree.

In *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349; 792 NW2d 686 (2010) (*LSEA*), our Supreme Court broadly overhauled this state's standing jurisprudence, overruling *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), and its progeny. The parties have not identified any post-*LSEA* published authority examining original (i.e., not appellate) standing within the context of a MERC proceeding, and we are aware of none. However, we can conceive of no reason why *LSEA*'s standing analysis would be inapplicable in the instant context. Thus, we analyze this issue within the *LSEA* framework.

MCL 423.216 expressly provides for a statutory cause of action in MERC for violations of MCL 423.210. Indeed, as discussed later in this opinion, Conwell's statutory charges in this matter were substantively meritorious. Because he had a viable cause of action, it necessarily follows that he had standing to pursue it. See *LSEA*, 487 Mich at 372 ("a litigant has standing whenever there is a legal cause of action").

## C. RIPENESS

Respondents contend that MERC erred by holding that Conwell's charges in this case were ripe for adjudication. We disagree.

As an initial consideration, although the parties have not briefed the issue on appeal, we question whether the justiciability doctrine of ripeness applies to MERC—as an administrative agency—in the first instance. The issue is clouded, however, by an unsettled question concerning the effect that *LSEA* may have had on Michigan's ripeness jurisprudence.[1]

---

[1] As explained at some length in *Huntington Woods v Detroit*, 279 Mich App 603, 614-616; 761 NW2d 127 (2008), before *LSEA* was decided, it was well-settled that questions concerning justiciability—including standing and ripeness—were rooted in constitutional considerations concerning the proper scope of judicial power. However, in *LSEA*, our Supreme Court overruled

In any event, we need not consider or decide the issue here. Assuming, without deciding, that the tacit legal premise of respondents' instant argument is sound—that the ripeness doctrine applies to MERC's exercise of quasi-judicial power in the same way that it applies to a Michigan court's exercise of actual judicial power—respondents' argument is nevertheless unpersuasive on the merits. As explained in *Huntington Woods v Detroit*, 279 Mich App 603, 615-616; 761 NW2d 127 (2008):

> The doctrine of ripeness is designed to prevent the adjudication of hypothetical or contingent claims before an actual injury has been sustained. A claim is not ripe *if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.* [Quotation marks and citations omitted; emphasis added.]

Conwell's statutory cause of action against respondents under the PERA was premised entirely on *past* events: respondents' act of entering into the 2015 CBA, which included agency-shop provisions, and their attempts to enforce those provisions against Conwell. Because nothing in the PERA indicates that damages are an essential element of an unfair-labor-practice charge, no future acts or contingencies, such as Conwell's termination from the District, were required for his charges in this matter to be ripe for adjudication. On the contrary, the "injury" redressed by such statutory charges is the unfair labor practice itself, not any specific harm or damage flowing

---

all decisions cited in *Huntington Woods* in which our Supreme Court had previously held that justiciability doctrines are based on the constitutional breadth of judicial power. *LSEA*, 487 Mich at 371 & n 18. Indeed, the LSEA dissent questioned whether the majority's decision had, in addition to removing the constitutional underpinnings of standing, done the same with regard to two other, closely related justiciability doctrines: mootness and ripeness. *Id*. at 429-431 (CORRIGAN, J., dissenting, joined by YOUNG and MARKMAN, JJ.). To our knowledge, our Supreme Court has not addressed this issue again since *LSEA* was decided. It has yet to explain what impact—if any—*LSEA* had on the constitutional basis of the ripeness doctrine. Consequently, in the absence of further guidance, decisions of this Court have continued to treat ripeness as an issue involving the constitutional scope of judicial power, relying on the decisions that LSEA overruled for their not-directly-overruled holdings concerning ripeness. See, e.g., *Van Buren Charter Twp v Visteon Corp,* 319 Mich App 538, 553-554; 904 NW2d 192 (2017) (*Van Buren*), oral argument on the application gtd 501 Mich 1069 (2018), citing Mich *Chiropractic Council v Comm'r of Office of Fin & Ins Servs*, 475 Mich 363, 379; 716 NW2d 561 (2006) (opinion of YOUNG, J.), overruled by *LSEA*, 487 Mich at 371 n 18.

If ripeness remains a constitutional doctrine that exists only to prevent the exercise of *judicial* power over cases that present no actual controversy, see generally *Van Buren*, 319 Mich App at 553-554 & n 1, then that doctrine presumably does not apply to the exercise of *quasi*-judicial power by an administrative agency, such as MERC, adjudicating a statutory (i.e., legislatively created) cause of action like the one at issue here. See *In re Complaint of Rovas*, 482 Mich 90, 98-99; 754 NW2d 259 (2008) ("Administrative agencies exercise what have been described as 'quasi-judicial' powers. However, such power is limited and is not an exercise of constitutional 'judicial power.' ") (footnote omitted).

from that unfair labor practice. See generally MCL 423.216 (providing a statutory cause of action to redress "[v]iolations of the provisions of" MCL 423.210). To hold otherwise would be to use the doctrine of ripeness to judicially graft a new element into unfair-labor-practice charges pursued under the PERA—one that the Legislature did not see fit to include in MCL 423.216 or MCL 423.210.

### D. PROPRIETY OF "AGENCY-SHOP" PROVISIONS AND ENFORCEMENT

Respondents argue that, based on MERC's erroneous interpretation of the "unambiguous" terms of the MOU, MERC erred by concluding that respondents committed unfair labor practices. In other words, respondents contend that MERC erred by concluding that their disputed actions contravened MCL 423.210. We disagree.

In pertinent part, MCL 423.209[2] provides:

> (1) Public employees[3] may do any of the following:
>
> (a) Organize together or form, join, or assist in labor organizations;[4] engage in lawful concerted activities for the purpose of collective negotiation or

---

[2] After relevant provisions of the PERA were amended by 2012 PA 349—but before Conwell instituted this action—several of those provisions were again amended by 2014 PA 414, effective December 30, 2014. Because the pertinent provisions were not altered by 2014 PA 414 in any way that is material to the instant analysis, this opinion does not analyze which temporal version of each statute should be applied here, instead simply relying on the current versions (as amended by 2014 PA 414).

[3] MCL 423.2(e) provides:

> "Employee" includes any employee, and is not limited to the employees of a particular employer, unless the act explicitly provides otherwise, and includes any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any act that is illegal under this act, and who has not obtained any other regular and substantially equivalent employment, but does not include any individual employed as an agricultural laborer, or in the domestic service of any family or any person at his home, or any individual employed by his parent or spouse, or any individual employed as an executive or supervisor, or any individual employed by an employer subject to the railway labor act, 45 USC 151 to 188, or by any other person who is not an employer as defined in this act.

[4] Notably, for purposes of the PERA, the term "person" is defined as "includ[ing] an individual, partnership, association, corporation, business trust, labor organization, or any other private entity." MCL 423.2(d).

bargaining or other mutual aid and protection; or negotiate or bargain collectively with their public employers[5] through representatives of their own free choice.

(b) Refrain from any or all of the activities identified in subdivision (a).

(2) No person[6] shall by force, intimidation, or unlawful threats compel or attempt to compel any public employee to do any of the following:

(a) Become or remain a member of a labor organization or bargaining representative or otherwise affiliate with or financially support a labor organization or bargaining representative. [Emphasis added.]

On the other hand, MCL 423.210 provides, in pertinent part:

(1) A public employer or an officer or agent of a public employer shall not do any of the following:

(a) Interfere with, restrain, or coerce public employees in the exercise of their rights guaranteed in section 9 [i.e., MCL 423.209].

* * *

(2) A labor organization or its agents shall not do any of the following:

(a) Restrain or coerce public employees in the exercise of the rights guaranteed in section 9. This subdivision does not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership.

* * *

---

[5] MCL 423.2(e) provides:

"Employer" means a person and includes any person acting as an agent of an employer, but does not include the United States or any corporation wholly owned by the United States; any federal reserve bank; any employer subject to the railway labor act, 45 USC 151 to 188; the state or any political subdivision thereof; any labor organization, or anyone acting in the capacity of officer or agent of such labor organization, other than when acting as an employer; or any entity subject to 1947 PA 336, MCL 423.201 to 423.217.

[6] Notably, for purposes of the PERA, the term "person" is defined as "includ[ing] an individual, partnership, association, corporation, business trust, labor organization, or any other private entity." MCL 423.2(d).

-9-

(3) Except as provided in subsection (4),[7] an individual shall not be required as a condition of obtaining or continuing public employment to do any of the following:

* * *

(c) Pay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value to a labor organization or bargaining representative.

* * *

(5) An agreement, contract, understanding, or practice between or involving a public employer, labor organization, or bargaining representative that violates subsection (3) is unlawful and unenforceable. *This subsection applies only to an agreement, contract, understanding, or practice that takes effect or is extended or renewed after March 28, 2013.*

Respondents' argument of this issue is premised entirely on the emphasized sentence immediately above (the grandfather provision). They contend that because they entered the MOU before March 28, 2013, their subsequent entry into CBAs that included agency-shop provisions was permissible under the grandfather provision, as were their attempts to *enforce* such CBAs. This ignores the fact that the grandfather provision is found in § 10(5), "which by its terms expressly applies only to agreements that violate Subsection (3) of § 10, MCL 423.210(3)." *Taylor Sch Dist v Rhatigan*, 318 Mich App 617, 631; 900 NW2d 699 (2016) (*Rhatigan*). This distinction is important because, in light of this Court's recent decision in *Rhatigan*, even if the MOU and the relevant CBAs in this case were saved from being unlawful under subsection (3) by the grandfather provision, respondents' attempts to *enforce* an agency-shop provision against Conwell nevertheless violated MCL 423.210(2)(a), for which there is no such grandfather provision. See *id.* at 632 ("the proscriptions of 2012 PA 349 (other than those in § 10(3)) do not apply *only* to contracts entered into after the effective date of the statutory amendment").

It is true that *Rhatigan* expressly ruled only with regard to whether the Taylor School District had violated MCL 423.210(1)(a)—i.e., the provision that applies to a "public employer," such as a school district—not ruling on whether the union had violated the similar subsection, MCL 423.210(2)(a), that applies to "a labor organization or its agents." In our view, however, the reasoning in *Rhatigan* applies with equal force to MCL 423.210(2)(a) and the facts presented here. Regardless of whether the agency-shop provisions in this case were saved by the grandfather provision, by attempting to enforce them against Conwell after March 28, 2013,

---

[7] Subsection (4) is not at issue here because it relates to the labor practices of police agencies and fire departments.

respondents violated MCL 423.210(2)(a). Specifically, such attempts at enforcement constituted an attempt to compel Conwell to financially support respondents, which was unlawful under MCL 423.209(2)(a). In turn, under MCL 423.210(2)(a), such conduct constituted restraint or coercion of Conwell's "rights guaranteed in section 9," i.e., MCL 423.209. In particular, respondents restrained or coerced Conwell with regard to his right, after he chose to resign from the respondent unions, "to be free of any responsibility to financially support a labor organization." See *id*. at 635. Thus, MERC did not err by deciding that respondents had committed an unfair labor practice under MCL 423.210(2)(a).

Nor did MERC err by concluding that the grandfather provision of MCL 423.210(5) did not, under the facts presented here, save respondents from liability from an unfair labor practice under MCL 423.210(3). Even assuming, arguendo, that the MOU *is* lawful under MCL 423.210(3) because of the grandfather provision, it does not follow that the subsequent CBAs are *also* lawful. The grandfather provision states that MCL 423.210(5) "applies only to an agreement, contract, understanding, or practice that *takes effect or is extended or renewed* after March 28, 2013." MCL 423.210(5).[8]

It is undisputed that *after* March 28, 2013, respondents entered into several CBAs— including the 2015 CBA that is at issue here—which included agency-shop provisions. Aside from the fact that the "A" in the acronym "CBA" stands for "agreement," it should be presumed that the Legislature was aware, when it enacted 2012 PA 349, that CBAs have also been recognized as a form of "contract." See, e.g., *Gogebic Community College Mich Ed Support Personnel Ass'n v Gogebic Community College*, 246 Mich App 342, 353; 632 NW2d 517 (2001) (using the phrase "the collective bargaining agreement" and "the contract" as synonyms); see also *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (noting that when the Legislature enacts new laws, it is presumed to be aware of existing judicial decisions). Thus, the 2015 CBA plainly qualifies as an "agreement" or a "contract" under the grandfather provision of MCL 423.210(5). Moreover, respondents do not dispute MERC's finding that they entered into the 2015 CBA on or about September 1, 2015—far after March 28, 2013. As a matter of both law and logic, the 2015 CBA could not have taken effect *before* there was mutual assent by all of the parties to it. See *Port Huron Ed Ass'n, MEA/NEA v Port Huron Area Sch Dist*, 452 Mich 309, 327; 550 NW2d 228 (1996) ("A collective bargaining agreement, like any other contract, is the product of informed understanding and mutual assent."). Indeed, respondents do not argue that the 2015 CBA somehow took effect before March 28, 2013, and any such argument would be specious. Respondents had prior CBAs covering the time period up until they entered into the 2015 CBA. Also, unlike other forms of contract, a CBA is "merely advisory until approved by" MERC, and thus the 2015 CBA arguably did not "take[] effect" until it gained MERC's approval. See *UAW*, 498 Mich at 295. In any event, for purposes of the grandfather provision,

---

[8] As applied to the facts of this case, we see no need to consult dictionary definitions in order to discern the plain meaning expressed by such language. See *In re Brody Living Trust (On Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 330871, issued August 7, 2018), slip op at 3-4 (noting that there is no need to consult dictionary definitions when, in context, the plain meaning of statutory language is apparent).

the 2015 CBA was clearly an "agreement" or a "contract" that took effect sometime after March 28, 2013.

Consequently, MCL 423.210(5) applies to the 2015 CBA, and the 2015 CBA's provisions were thus unlawful if they failed to conform to the requirements set forth by MCL 423.210(3). There is no dispute that its agency-shop provisions did not. They conditioned Conwell's continued public employment with the District on his payment of a "fair share" fee to the respondent unions despite his status as a nonmember. In the wake of 2012 PA 349, this contravened MCL 423.210(3). See *UAW v Green*, 302 Mich App 246, 262-263, 279; 839 NW2d 1 (2013). For those reasons, we conclude that MERC did not err by deciding that the 2015 CBA's inclusion of the contested agency-shop provisions constituted an unfair labor practice under MCL 423.210(3).

### E. CIVIL FINES

Finally, respondents posit that MERC erred by assessing a civil fine of $500 against each respondent under MCL 423.210(8). We disagree.

Respondents offer no argument that MERC lacked authority (or jurisdiction) to assess the $500 fines against respondents. Rather, respondents' argument is premised entirely on their contention that such fines under MCL 423.210(8) are effectively "punitive damages" and, therefore, can only be imposed upon a finding of some improper intent on respondents' behalf. In support, they rely on *Senior Accountants, Analysts & Appraisers Ass'n v City of Detroit*, 60 Mich App 606, 613 n 2; 231 NW2d 479 (1975) (*Senior Accountants*) ("At the risk of generating dicta, we note that the plaintiffs are correct in asserting that MERC lacks the authority to award punitive damages, because such would not 'effectuate the policies of' the act."), quoting MCL 423.216(b), as amended by 1965 PA 397.

For several reasons, respondents' argument is meritless. To begin with, the cited portion of *Senior Accountants* does not bind this Court because: (1) it pre-dates the November 1, 1990 conflict deadline, see MCR 7.215(J)(1); (2) it was self-recognized as nonbinding obiter dictum; and (3) it interpreted the PERA as it existed in 1975, not as it exists today. More importantly, respondents' argument utterly ignores the language that our Legislature chose to employ in MCL 423.210(8). Specifically, despite the principle that "[n]othing will be read into a clear statute that is not within the manifest intention of the Legislature as derived from the language of the statute itself," *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 102; 693 NW2d 170 (2005), respondents fail to point to any language in the PERA that requires a finding of fault or intent on a union's behalf before a fine may be assessed against it under MCL 423.210(8). Respondents also fail to explain how or why this Court should deem the "civil fine of not more than $500.00" that is described in MCL 423.210(8) to *not* be a "civil fine" at all, but rather a form of "punitive damages."[9] Indeed, we cannot embrace such a construction of MCL 423.210(8). Subsection (8)

---

[9] Nor do respondents contend that the "civil fine" at issue here was, in effect, so punitive that it should be considered a form of criminal punishment under the factors discussed in *Dawson v Secretary of State*, 274 Mich App 723, 736; 739 NW2d 339 (2007).

was added to MCL 423.210 by 2012 PA 349, and it has long[10] been settled "that punitive damages are available in Michigan *only* when expressly authorized by the Legislature." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 765; 685 NW2d 391 (2004). It would be inappropriate to presume that the Legislature used the phrase "civil fine" in MCL 423.210(8) when it actually meant "punitive damages." See *Polkton Charter Twp*, 265 Mich App at 102 ("The first criterion in determining intent is the specific language of the statute. The Legislature is presumed to have intended the meaning it plainly expressed.") (citations omitted).

Thus, we reject respondents' instant claim of error. It has no basis in the relevant statutory language, and respondents have provided no rationale explaining why the statutory language can or should be ignored in this instance.

Affirmed.

/s/ Brock A. Swartzle
/s/ David H. Sawyer

---

[10] See *Eide v Kelsey-Hayes Co*, 431 Mich 26, 51; 427 NW2d 488 (1988) (GRIFFIN, J., concurring in part and dissenting in part).